**Rickey Dale CONLEY et al.**

v.

**LAKE CHARLES SCHOOL BOARD et al.**

**Civ. A. No. 9981.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.

June 11, 1970.

A. P. Tureaud, New Orleans, La., Margrett Ford, Legal Defense Fund, New York City, for plaintiffs.

Frank T. Salter, Jr., Dist. Atty., Henry L. Yelverton, Asst. Dist. Atty., Lake Charles, La., for defendants.

HUNTER, District Judge:

This case was included with the other Louisiana school cases decided by the Fifth Circuit *sub nom*. Hall v. St. Helena Parish School Board, 417 F.2d 801 (May 28, 1969). Upon remand, this Court directed the School Board to confer with the Office of Education of the Department of Health, Education and Welfare ("HEW") to develop a new desegregation plan. On July 5, 1969, the School Board filed a new plan and HEW filed a completely different plan.

On July 21, 1969, a hearing was held at which the School Board presented testimony in opposition to the HEW plan and Dr. A. T. Miller, the HEW representative in charge of drawing the plan for Calcasieu Parish, testified in support of the HEW plan. The Court ruled from the bench that the Board's plan was inadequate and on July 22, 1969, the Board filed an amended and substantially different plan, adopting a system of geographic zoning of elementary schools in the city of Lake Charles. The Board's plan was approved by the Court on July 24, 1969.

After the opening of the 1969–70 school year, the Board filed a report disclosing the results achieved under its desegregation plan.

■ On March 11, 1970, plaintiffs filed a motion for further relief seeking an order requiring the School Board to implement the HEW plan beginning with the school year 1970–71. On March 18, 1970, the School Board filed a plan of zoning of junior and senior high schools in Lake Charles which it proposes to implement for the beginning of the school year 1970–71. A hearing was held on April 14, 1970, at which school officials testified in favor of the School Board plan and in opposition to the HEW plan. The Court concludes that the plan presented by the Board at the hearing does not convert the Calcasieu Parish School System to a unitary one within the meanings of the Supreme Court decisions in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L. Ed.2d 19; Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; and the decision of the Fifth Circuit in Ellis v. Orange County (1970).

The criteria used by the Board in establishing their zone lines—considering man-made and natural boundaries—precludes that plan from coming within the purview of a true "neighborhood system," as defined in Ellis v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203 (5th Cir., February 17, 1970). In that decision the Court said:

"[T]he neighborhood system, based on school capacity, must be observed without exception. This will prevent any variance based on traffic conditions * * * or by zone line locations * *. *Variances by arbitrary zone lines, or for reasons of traffic, while reasonable on their face may destroy the integrity and the stability of the entire assignment plan.* If Orange County wishes to maintain a neighborhood assignment system, then it must do so without variances. *Each student in the system must be assigned to attend the school nearest his or her home, limited only by the capacity of the school, and then to the next nearest school.* Id. at p. 207. (Emphasis added.)

In a parallel case involving the City of Monroe, Louisiana, attendance zone lines based upon the *same* criteria as those used in Lake Charles and producing similar results were held unacceptable by the Court of Appeals.

In *Green* (supra), the mechanics of what must be done to bring about a unitary system were detailed. They were stated in terms of eliminating the racial identification of the schools in six particulars: composition of student bodies, faculty, staff, transportation, extra-curricular activities, and facilities. 391 U.S. at 435, 88 S.Ct. 1689.

All district courts have been mandated to put in effect for the 1970–71 school year the pertinent provisions of Singleton v. Jackson Municipal Separate School District relating to faculty, staff, transportation, extra-curricular activities, facilities and transfer. 419 F.2d 1211. Accordingly, it is ordered that the School Board shall announce and continue to implement for 1970–71 the following policies:

## DESEGREGATION OF FACULTY AND OTHER STAFF

■ 1. For the 1970–71 school year, the principals, teachers, teacher-aides and other staff who work directly with

children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for black students or white students. The district shall assign the staff described above so that the ratio of black to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

The school district shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.

2. Thereafter, staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.

■ 3. If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

Prior to such a reduction, the school board will develop or require the development of non-racial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

"Demotion" as used above includes any re-assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period.

## MAJORITY TO MINORITY TRANSFER POLICY

■ The school district shall permit a student attending a school in which his race is in the majority to choose to attend another school where his race is in the minority. The Orange County (5th Cir., February, 1970) conditions shall be applicable concerning transportation, etc.

## TRANSPORTATION

The transportation system, in those school districts having transportation systems, shall be completely re-examined regularly by the superintendent, his staff, and the school board. Bus routes and the assignment of students to buses will be designed to insure the transportation of all eligible pupils on a non-segregated and otherwise non-discriminatory basis.

## SCHOOL CONSTRUCTION AND SITE SELECTION

All school construction, school consolidation, and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented.

## ATTENDANCE OUTSIDE SYSTEM OF RESIDENCE

If the school district grants transfers to students living in the district for their attendance at public schools outside the district, or if it permits transfers into the district of students who live outside the district, it shall do so on a non-discriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual school system.

## BI-RACIAL COMMITTEE

Pursuant to the pattern of Fifth Circuit decisions in *Ellis*, supra, and *Singleton*, 419 F.2d 1211, a bi-racial committee is to be named and is to function as a tool to carry out the plan and insure a unitary system. The membership is to be divided equally between whites and blacks. (See Judge Brown's Order in *Singleton*, supra).

## STUDENT ASSIGNMENT PLANS

All agree that Wards 1, 2, 5, 6, 7 and 8 now operate as unitary systems. Ward 3 encompasses the City of Lake Charles. Several of the schools are deep within black neighborhoods. Others are on fringe areas.

"In the typical dual system in operation prior to Brown I and II, the student was assigned to attend the school nearest his or her home. This so-called neighborhood assignment system was designed to eliminate transportation costs and permit the student to remain as near home as possible. Under the dual system as ruled unconstitutional, a Negro student would be assigned to the nearest Negro school to his or her home and a white student would be assigned to the nearest white school." (See Ellis v. Board of Public Instruction of Orange County, supra.) Under a neighborhood assignment basis in a unitary system, the child is to attend the nearest school whether it be a formerly white school or black school. Calcasieu's approach in its April 13th zones is not acceptable for reasons heretofore stated. We shall approve a neighborhood plan which will bring about results required without burying the public schools by the use of unreasonable requirements for both black and white. This can be done in keeping with the personal dignity of all citizens, of whatever race.

At our request the School Board has redrawn its zones for Ward 3 so that each student is assigned to attend the nearest school to his or her home, limited only by the capacity of the school.[1] This, in my judgment, meets the requirements of Orange County.

The School Board's plan, as revised after receiving instructions from the Court on "as the crow flies" zoning, is attached and made a part hereof. The projected enrollment for each school in the Parish is disclosed in the plan, marked Exhibit A.

The Ward 3 zones, as approved, are revealed in the documents marked as exhibits and reflect the zoning patterns demonstrated by three overlays and map. The overlays reflect the zoning in a grades 1 through 6 organization; another for grades 7, 8 and 9; and another for high school grades 10, 11 and 12. It should be emphasized that the figures shown do not reflect children who may choose the majority to minority transfer privilege, but rather only those children residing in the zones as shown by the maps. The zones have been drawn as mathematically perfect as possible in order to provide that children will attend the school nearest their residences "as the crow flies." The only limiting factor in this zoning procedure is the capacity of schools. In some few instances the school capacity prevented this, as illustrated by the accompanying maps.

The schools in Ward 4 were unitized in September of 1969, with the exception of the Mossville-West Lake Elementary schools. Now, the 9th grade has been returned to Mossville, making that school a grade 1–9 plant for September of 1970.

1. Entered in Record as Exhibit entitled "Basic Map—Ward 3", with overlays.

This was done at the request of the black people of Mossville, through their representative on the committee appointed by the plaintiffs (Mr. James Rigmaiden).

A minor amendment has also been submitted and is hereby approved. This amendment is made at the request of citizens of this portion of the parish that will assign some students in Grades 10, 11 and 12 to the Sulphur High School who were previously zoned to attend West Lake High School for the 1969–70 school year. This was done in order to effect a better balance between black and white students in the West Lake and Sulphur high schools.

The plan as approved by the Court, combined with those presently in effect in the other wards, converts the Calcasieu system into a unitary one "within which no person is effectively excluded from any school because of race." Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19. No one is denied the right to an integrated education. If a student is assigned to a school where his race is in a majority, all that student has to do is merely request a transfer to any school in which his race is in a minority. It is projected that there will be approximately 10,171 black students in the Calcasieu Parish School System in the 1970–71 school year. There are no all-black schools. However, there are six schools that are 90% or more black. *The National Observer* of January 26, 1969, contains a chart entitled "Racial Isolation in Public Schools." The quoted source is HEW. The figures are for 1968–69, and reveal the extent of de facto segregation in both North and South. A quick perusal of these figures, by comparison, put Calcasieu Parish in the forefront. See chart next page:

| City | Negro % of Total Students | % Negroes in Majority White Schools | % Negroes in 95–100% Negro Schools |
|---|---|---|---|
| D.C. | 93.5 | 0.9 | 89.2 |
| Chicago | 52.9 | 3.2 | 85.4 |
| Los Angeles | 22.6 | 4.7 | 78.5 |
| New York City | 31.5 | 19.7 | 43.9 |
| * Houston | 33.3 | 5.3 | 86.4 |
| Baltimore | 65.1 | 7.7 | 75.8 |
| Dallas | 30.8 | 2.1 | 82.2 |
| Philadelphia | 58.8 | 9.6 | 59.8 |
| Indianapolis | 33.7 | 22.4 | 52.9 |
| Boston | 27.1 | 23.3 | 33.6 |
| Pittsburgh | 39.2 | 21.3 | 42.7 |
| Kansas City, Mo. | 46.8 | 14.0 | 67.3 |
| Buffalo | 36.6 | 27.0 | 61.1 |
| Oklahoma City | 21.8 | 12.5 | 79.7 |
| St. Louis | 63.5 | 7.1 | 86.2 |
| Atlanta | 61.7 | 5.4 | 90.0 |
| Orleans Par., La. (New Orleans) | 67.1 | 8.8 | 81.2 |
| Newark | 72.5 | 2.1 | 75.8 |
| Gary, Ind. | 61.6 | 3.1 | 80.8 |
| Rochester, N. Y. | 28.9 | 45.6 | 12.1 |
| Fresno, Calif. | 9.0 | 15.8 | 72.5 |
| Omaha, Neb. | 18.1 | 20.5 | 38.3 |

* This situation will be drastically changed in Houston in September, 1970, under an "Equidistant Zoning Plan of Racial Integration" order which was entered by the Chief Judge of the Southern District of Texas on June 1, 1970.

The HEW plan was prepared in the summer of 1969. Viewed from any direction, it would be a disaster. With commendable candor, those who testified for it in the summer of 1969 admitted that the preemptive objective of mixing excluded any consideration of the plan's impact economically or educationally. There are glaring inconsistencies in the statistics as to the mixing which it would bring about. Children would be uprooted from their neighborhoods and transported to other neighborhoods miles away. The HEW plan here provides for massive cross-town busing. The enrollment in Ward 3 is projected to be 22,956 students. The neighborhood zone plan buses 6,538, and these children are bused from where they live to their nearest school. HEW's plan asked for massive transportation of 16,686, a 155% increase. This would require 85 additional buses and 85 additional drivers. Currently, there are 61 buses. Using the current average route load of 56.2 pupils means an additional 180.6 bus routes would have to be established. The purchase price alone of these additional buses would exceed $500,000. When salaries, insurance, and other expenses are added, the cost for the first year's operation would amount to $947,218.75. This would have a staggering effect on the School Board's budget. These are conservative estimates. They are based on routes (as the crow flies) with no attempt to calculate more exactly the effect of neighborhood touring and the actual street routes the buses would have to follow. The School Board has prepared and filed with the Court a detailed analysis of the busing that would be required and the maps illustrative of the distances. This is marked Exhibit A and attached to the original of this opinion. The exhibit also reveals the number of children in each school who are now bused and who would have to be bused under HEW. For example, in the elementary schools Watkins, Fisherville and Oak Park, five children are now being bused, but under HEW 484 children would be bused. This means that 484 children in this instance would be uprooted from their neighborhoods and bused miles away from their residences into other neighborhoods. HEW was faced with an almost insurmountable time schedule in the summer of 1969 when these plans were prepared. Its task was difficult and time was of the essence, and all in all, HEW obviously did a commendable job of carrying out its assignment. However, this Court is convinced that neither the white nor black children would appreciate being gerrymandered about from one neighborhood to another.

The cost of massive busing would not be the only cost problem involved. Incalculable would be the cost required to convert school buildings to accommodate grade levels. Burdensome as would be the result of the HEW plan, it would be only the beginning of the problems which the plan would heap on this community. Of far more devastating significance would be the harms to the well-being of the children themselves, black and white alike. The totality of the effect on the child forced to attend three separate schools during the first six grades of his school years would be horrendous. In many cases the HEW plan would add an hour or more to the school day of many, many children. Where once the child could walk or ride a short distance, he now would arise an hour earlier and be bused a long way from home. Families would often be divided among as many as three schools, many miles separated. Young children could not enjoy the security of the familiar presence of brothers and sisters.

With the diversity and multiplicity of decisions involving the subject, many questions haunt us each time another case of this nature arises. What does a school district have to do to convert to a unitary system? What is a unitary system? Is a plan drawn strictly along residential lines acceptable? What if we change attendance zones to desegregate two schools, and then either whites or blacks move to avoid desegregation? Must the lines be drawn again? How

many times? Time and time again we have been confronted with these questions and have endeavored to decide the cases according to the law of the day, and then we move on to another case another day, with no real answers.

HEW's statistics reflect that in northern states, as well as southern, the black population is frequently concentrated in geographical areas and that as a result, many northern and southern schools in metropolitan areas serve predominantly only black students. The extent to which de facto segregation makes a system dual has not as yet been spelled out by the Supreme Court. The language in *Alexander* is in the form of a directive to the school board to perate—

"as unitary systems within which no person is to be effectively excluded from any school because of race or color."

Again, in Northcross v. Board of Education, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (March, 1970), the Chief Justice wrote a special concurring opinion in which he used this pertinent language:

"The suggestion that the Court has not defined a unitary system is not supportable. In Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, we stated perhaps too cryptically that a unitary system is one within which no person is to be effectively excluded from any school because of race or color * * *."

Paraphrasing these two sentences, what the Chief Justice has said is that the Court *has* defined a unitary system, but that they have not made their definition clear. It is crystal clear that this is what the Chief Justice meant, because in the next sentence he used this language:

"From what is now before us in this case it is not clear what issues might be raised or developed on argument; as soon as possible, however, we ought to resolve some of the basic practical problems when they are appropriately presented, including whether, as a constitutional matter, any particular racial balance must be achieved in the schools; to what extent school districts and zones may or must be altered as a constitutional matter; to what extent transportation may or must be provided to achieve the ends sought by prior holdings of this Court. Other related issues may emerge. However, for the reasons stated, namely, that the Court is already disabled by a vacancy of long standing and further disabled in this particular case, if not earlier, I join the result reached by the Court."

This comes through loud and clear. Sometime in the not too distant future a definitive decision in these matters will be made. Meanwhile, it is our duty to make school integration a reality, remembering that nothing is to be gained and much is to be lost if we are not realistic and sensible in approaching the problem. This must be remembered by both black and white.

■ The HEW plan is rejected. The Court really does not believe anyone wants it. Nothing is to be gained and much is to be risked or lost by driving the process of desegregation to the tipping point of escapism or re-segregation. Our task is to fashion a remedy which will insure that no person is effectively excluded from any school because of race. We have endeavored to carry out this duty without burying the public school system. Any plan (such as HEW) which results in harming the attendance and financing of the public schools presents serious and substantial administrative, economical and educational problems. From an education standpoint, we agree with the approach used and adopted in the rural wards, because in those wards the approach was basically neighborhood zoning. The schools were very close to each other, and there was no overall residential pattern, but the cross-town busing suggestion for the City of Lake Charles is just not desirable in the interest of education.

The School Board's plan presented at the April 14th hearing is rejected. The plan as revised (June 4 ltr. Exh. A) is approved.

The Honorable Ben C. Connally, Chief Judge of the Southern District of Texas, entered his opinion on June 1, 1970, ordering the Houston Independent School District to institute what he referred to as an "equidistant zoning plan of racial integration." That decision, like this Court's, is patterned upon *Orange County*. Judge Connally, in rejecting cross-town busing, made this pertinent observation:

"Our hypothetical student well might say to the Superintendent of Instruction, 'You are excluding me from School A, two blocks from my home, because I am black, and for no other reason. How can you do this when the Supreme Court of the United States in its latest pronouncement on the subject imposes on you the duty to operate as [a] unitary school system *within which no person is to be effectively excluded from any school because of race or color?'* I would be interested to know how this question would be answered." (Emphasis added.)

Following the instructions of the Fifth Circuit in Ellis v. Orange County; United States v. Hinds County; Davis v. Board of Commissioners of Mobile, 430 F.2d 883; (all Fifth Circuit cases, 1970), a bi-racial committee is to be constituted forthwith from the names submitted by the parties to this suit. Counsel for plaintiffs in the suit for desegregation have designated for this committee the persons named below:

Mr. Richard Brown
Mrs. Rupert Clemons
Mr. Edward Harris
Mr. Willie Marchand
Mrs. Patsy Porter

Mr. James Rigmaiden
Mrs. Lillie Shelton
Mr. Dennis Ware
Rev. V. W. Washington

A copy of the letter from plaintiffs' counsel nominating these citizens is appended and made a part hereof.

The School Board has designated the following citizens to serve on the committee:

Mr. A. Lane Plauche
Mr. Hyman Simmons
Mr. James Fox
Mr. Dean Fuller
Mr. Edwin L. Lively

Mr. Arthur L. Gayle, Jr.
Mr. J. J. Haxthausen
Mrs. H. P. Francis
Mr. Tom O. Clement

This committee is hereby constituted, and Mr. A. Lane Plauche is named temporary chairman. The committee's duties are advisory only. It is charged with the responsibility of investigating, consulting, and advising the Court and School Board periodically with respect to all matters pertinent to promote a unitary system as ordered by the Fifth Circuit in *Ellis, Singleton IV* and *Davis*. The specific task of the bi-racial committee is best described by quoting a paragraph from the Fifth Circuit decision of June 8, 1970, Singleton v. Jackson Municipal Separate School District, 425 F.2d 1211, in *Davis*:

"The district judge is also directed to require that the bi-racial committee serve in an advisory capacity to the school board in the areas of the operation of the majority to minority transfer rule, the promulgation and main-

tenance of zone lines, and in school site location. As we said in Ellis v. Orange County, with respect to eliminating all Negro student body schools:

" ' * * * The majority to minority transfer provision under the leadership of the bi-racial committee is a tool to alleviate these conditions now. Site location, also under the guidance of the bi-racial committee, will guarantee elimination in the future. In addition, open housing, Title VIII, Civil Rights Act of 1968, 42 USCA, § 3601 et seq., Jones v. Alfred H. Mayer & Co., 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189, will serve to prevent neighborhood entrapment.' "

If ever there was a time when a Court should bend every effort to be credible and persuasive to those affected by its order, that time is now. The answer which the Court gives for Ward 3 is: Go to the school nearest to which you live. No one is effectively excluded from any school because of race. Most students are assigned to schools with fully integrated student bodies. The remaining are not condemned to a segregated public school education. If such a prospect exists, it may be corrected immediately at the desire of any child so affected who may transfer and ride free of charge to the nearest school in which his or her race is in a minority. Thus, every Negro child and every white child has an opportunity for an integrated education *today*—the majority of them simply by attending a school nearest their homes. They will receive such an education from a completely integrated faculty and staff.

The plan as enumerated herein constitutes a unitary system and is to be implemented forthwith. This opinion constitutes findings, conclusions and order.

EXHIBIT A

CALCASIEU PARISH SCHOOL BOARD

1724 Kirkman Street
Lake Charles, Louisiana 70601

June 4, 1970

The Honorable Edwin F. Hunter
District Judge
United States District Court for
the Western District of Louisiana
Lake Charles, Louisiana 70601

Dear Judge Hunter:

I respectfully submit a revised plan for unitizing the schools of Calcasieu Parish based upon the most recent action of the Calcasieu Parish School Board. This is a revision of the plan submitted March 17, 1970, and follows as closely as possible the Orlando, Florida plan for unitizing the schools of that system.

The following plan, ward by ward, is proposed, and in some instances merely repeats the plan of March 17, 1970, as all wards were unitized with the exception of Ward Three:

WARD I:

This ward was completely unitized in September 1969.

(Same as submitted March 17, 1970).

WARD II:

This ward was completely unitized in September 1969.

(Same as submitted March 17, 1970).

WARD III (Lake Charles):

This plan is submitted by maps which accompany this document and reflect the zoning patterns demonstrated by three overlays and map. The overlays reflect the zoning in a one through six organization, another for seven, eight, nine, and another for high school, ten, eleven and twelve.

Statistics are attached showing the white-black numbers that will be incorporated in the zone referred to. It should be emphasized here that the figures shown do not reflect black

children that may choose the majority to minority transfer privilege, but rather only those children residing in the zones as shown by the maps. The zones have been drawn as mathematically perfect as possible in order to provide that children will attend the school nearest their residence "as the crow flies." The only limiting factor in this zoning procedure was the capacity of schools. It was not always possible to zone children where they would be nearest the school for the reason that the school capacity prevented this in several instances as will be shown by the map.

WARD IV (Sulphur-Westlake):

The schools in Ward IV were unitized in September 1969 with the exception of the Mossville-Westlake schools. The plan submitted to the Court for unitizing this segment of Ward IV is as follows:

1. Reassign ninth grade students to Mossville School, making this school a one through nine school for September 1970.

a) A minor amendment is submitted upon the request of citizens of this portion of the parish that will assign some students in grades ten, eleven and twelve to the Sulphur High School who were zoned so as to attend Westlake High School for the 1969–70 school year. This was done in order to effect a better balance of Negro and white students between the Sulphur High School and the Westlake High School. A description of this amendment is as follows:

(1) Students who will be in grades ten, eleven and twelve in the 1970–71 school session, in the Mossville area living south of the old Brimstone Railroad and west of Prater Road (including both sides of Prater Road) will be assigned to Sulphur High School.

(2) Students who will be in grades ten, eleven and twelve during the 1970–71 school session, in the Mossville area living north of the old

Brimstone Railroad and those living east of Prater Road (excluding students who live on Prater Road) will be assigned to Westlake High School.

(3) Students who will be seniors at Westlake High School during the 1970–71 school session and affected by the zoning change will have the option of attending either Westlake High School or Sulphur High School.

2. S. P. Arnett School will continue to operate as a one through nine school in this portion of the ward.

3. Elementary schools in the Westlake-Mossville area are zoned in a one through five organization, with the exception of the Mossville School, and it will be retained as a one through nine school as mentioned above.

All schools in the Mossville-Westlake area have been zoned so as to embrace the neighborhood school concept. Table of statistics attached indicates the pupil mix in these schools.

(Same as submitted March 17, 1970).

WARD V:

This ward was completely unitized in September 1969.

(Same as submitted March 17, 1970).

WARD VI:

1. This ward will be completely unitized insofar as pupils are concerned by organizing the Grand Avenue School into a six-seven-eight middle grade school for both races.

2. Students of both races will attend DeQuincy High School with grade organization of nine through twelve.

3. DeQuincy Elementary School will contain students of both races on a K-five organization. Statistics attached indicate the pupil mix in this ward.

(Same as submitted March 17, 1970).

WARD VII:

This ward was completely unitized in September 1969.

(Same as submitted March 17, 1970).

WARD VIII:

This ward was completely unitized in September 1969.

(Same as submitted March 17, 1970).

The plan submitted recognizes and allows majority to minority transfers in all instances where zones have been established.

The faculty assignment for the teachers of Calcasieu Parish will consist of a racial balance which substantially complies with the Singleton Decision as ordered by the U. S. Fifth Circuit Court of Appeals. Statistics for the faculties on a school by school basis are not attached as employment and assignments are still being done by the staff of this office.

Respectfully submitted,

/s/ ——————————————

C. W. Hanchey, Superintendent

Calcasieu Parish Schools

CWH/lg

encls.