UNITED STATES of America,
Plaintiff,

v.

LUBBOCK INDEPENDENT SCHOOL
DISTRICT, Edwin H. Irons, Superintendent, the Texas Education Agency,
Dr. J. W. Edgar, Commissioner of Education, Defendants.

Civ. A. No. 5–806.

United States District Court,
N. D. Texas,
Lubbock Division.

Aug. 25, 1970.

John N. Mitchell, U. S. Atty. Gen., Jerris Leonard, Asst. U. S. Atty. Gen., Brian K. Landsberg, Joseph D. Rich, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Charles L. Cobb, Lubbock, Tex., Crawford C. Martin, Atty. Gen., Pat Bailey, James McCoy, Asst. Attys. Gen., Austin, Tex., for defendants.

## MEMORANDUM OPINION

WOODWARD, District Judge.

This suit was originally filed by the United States of America, through the Department of Justice, in the Dallas Division of this Court, and pursuant to a mandate of the Fifth Circuit Court of Appeals, 431 F.2d 1313, the case was severed as to the Lubbock Independent School District and transferred, August 19, 1970, for an immediate hearing. The position of the United States of America is that the Defendant, Lubbock Independent School District, should show cause why it should not adopt a plan of pupil assignment in the School District in accordance with that proposed and attached to its Complaint. Pursuant to the mandate, conferences have been held between the Court and the attorneys involved and a full hearing on the merits of the matters in issue was heard before the Court on August 21st and August 22nd, 1970, and all parties introduced and presented testimony and exhibits to the Court.

In essence, the Government charges that the Defendant School District has operated and continues to operate a dual school system, separated as to races, in that there has been an assignment of students and faculty to schools in accordance with an official state policy requiring racial segregation in the public schools. The evidence introduced by the Government is intended to show that a vestige of the dual structure exists at Struggs Junior High School, Dunbar Senior High School, and in six of the District's elementary schools. The Defendant School District's reply and position is that each of these schools (elementary, junior high and high school), are assigned pupils strictly on a neighborhood school basis and that there is no such dual structure existing in the operation of the Lubbock Independent School District.

Immediately after Brown I[1], and for the school year 1955–1956, there was a total enrollment of 18,410 students in the Lubbock Independent School District and this had grown to 33,213 for the 1969–1970 year. It was comprised of 82.8% Anglo students in 1956 as compared with 67.51% in 1969–70; 8.33% Mexican-American in 1955–56 as compared to 20.84% Mexican-American in 1969–70; and 8.86% Negro in 1955–56 as compared to 11.50% Negro in 1969–70. Defendants argue that it is this growth and the shifting of populations that leaves this school system with schools that are either all black, or all Mexican-American, or substantially so. The percentage of racial enrollment in the schools at issue will be discussed later in this opinion.

If any of the schools in question were racially identifiable as to either Negroes or Mexican-Americans at the time of Brown I, and because of the operation of state law or policy, or if since such date they have become so racially identifiable as to racial minorities because of the acts of the Defendant School District, then it is required that school attendance boundary lines be re-drawn in order to wipe out such vestiges of a dual school system in these schools and in the District prior to the 1970–71 school year. See Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and Alexander v. Holmes County Board of Educa-

1. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

tion, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19 (1969).

Although the problems are inter-related and decision of a problem in one area affects that in another, it adds to an understanding of the situation to discuss the pupil assignment evidence and facts in three separate categories, that is, high school, junior high school, and elementary schools.

## HIGH SCHOOLS

The school in question is Dunbar High School which is located in the eastern portion of Lubbock and has been in its present position since 1958. Prior to that time, Dunbar was located about one mile west of its present location and the new building was built in 1958 with a capacity of 800 students, but when adjusted for special education classes would serve 773 students. At the present time, grades 9 through 12 inclusive are assigned to this school and it has unquestionably been an all-black school for many, many years, and was operated as a segregated black school under the laws that existed in the State of Texas prior to Brown I. In the 1969–70 school year there was an enrollment of 470; 457 or 97.24% were black, 1.91% Mexican-American, and .85% Anglo. This has been the situation prior to and since Brown I, when it was 100% black. The Defendant School District has attempted to correct this racial imbalance by increasing, at various times, the area to be included in the Dunbar School attendance zone, and has taken in several adjacent blocks, but, although their estimates at the time such steps were taken were that integration would be effected, it failed to materialize. For instance, in 1968–69 this District was enlarged in the southwest corner and there were an estimated 53 whites that would attend Dunbar, but at the time of registration, only 2 remained in this school zone. This is evidence of flight by white families that has existed out of this particular zone when the School Board affirmatively attempted to solve their dilemma. Nevertheless, Dunbar is a school that was traditionally operated as a segregated black school under the laws of the State of Texas and the vestige of a dual system, in which this school was segregated as black, remains to this day.

Briefly, the other high schools are Estacado, which was opened in September of 1967 with a new and excellent physical plant with a capacity of 1,600 students. At the time it was opened it had an enrollment of 881, 55.73% Anglo, 18.28% Mexican-American, and 25.88% Negro. In 1968–69 it had an enrollment of 924, 43.07% Anglo, 22.62% Mexican-American and 34.31% Negro; and in 1969–70 it had an enrollment of 1,038, 33.91% Anglo, 26.11% Mexican-American, and 39.98% Negro. The zone assigned to Estacado is uniform as to its geographical area and the residential pattern as to race in this area is substantially that of the percentage of registration in the school. Estacado was carved out of the Lubbock High School District when Lubbock's population expanded in this direction at or about the time the school was commenced. I do not find that Estacado was ever operated as a segregated school, as the above figures indicate in the year that it was opened. Admittedly these percentages are changing, but the only explanation that can be gathered from the evidence before this Court is that it constitutes a flight of Anglo families from the area and an influx of minority groups and there is no showing of any conduct or act by the School District which causes it. However, this flight may not be as great as it appears, because in 1967–68 there were 491 Anglo students while there were 352 in 1969–70, and it was estimated that there would be a decrease of only 24 Anglo students in the 1970–71 school year. The particular situation found in Estacado is considerably muddled at this time due to the tragic tornado that struck just west of this area on May 11, 1970, and families who were displaced by the storm have moved into the Estacado area and there is no practical way at this time, prior to any registration, to know what the actual 1970–71 figures will be, but it cannot be said that Estacado is a seg-

regated school or that there is any vestige of a previously operated dual school system as it was conducted at Estacado.

Lubbock High School: This high school is located almost in the geographical center of the City of Lubbock and has been in operation since the year 1931 with several additions being made thereto, the latest in 1961. All of the evidence points to the fact that this building is in excellent condition, costing less to maintain than other buildings, and was exceptionally well constructed and by all standards is a modern, excellent high school facility. Of course, in 1954 this was an all-white school, but the pattern has changed somewhat, although gradually, over the years and in 1969–70 there was a registration of 1,797, 64.83% Anglo, 33.89% Mexican-American and 1.28% Negro. This school has a capacity of 2,100. Since 1954 there have been changes in the boundary lines of Lubbock High School, the principal one being that Estacado was carved out of the District in order to give a neighborhood high school to the northeastern part of Lubbock, and to relieve crowding in Lubbock High School, all of which made it easier for students to attend a high school near their home, and to relieve congestion and crowding at Lubbock High School. There have been other minor changes in the Lubbock High School attendance zone but these are minor in nature and have no racial assignment significance whatsoever.

Two other high schools are Coronado and Monterey, lying in the western and southwestern part of the city, and these have been built to accommodate high school students in these areas, which has been the major direction of the expansion of Lubbock's population in its growth since 1955. In 1969–70 Coronado, with a capacity of 1,600, had an enrollment of 1,533, and Monterey, with a capacity of 2,100, had an enrollment of 2,000, both of which was substantially Anglo, with a percentage of 99% or better. These two high schools are located at points so as to serve the geographical area surrounding them and are not zoned

in such a manner as would indicate that any minority group, who live within a reasonable distance thereof, would be excluded from attendance.

■ It is quite apparent from the above that the high school that still remains segregated because of pre-1954 laws and practices is Dunbar High School, although it is in a different location from what it was in 1954. It was all-black then, and for all purposes is all-black today. The geographical area assigned to Dunbar High School appears reasonable from a geographical standpoint; the area assigned is comparable in size to that assigned the other high schools; it does not appear to be unreasonably shaped in an irregular manner; and it appears that the school is located within these geographical lines at a point best able to serve the population of the area. However, under Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689 (1968); Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29 (1969), and Youngblood v. Board of Public Instruction of Bay County, 430 F.2d 625 (5th Cir. 1970), this is not sufficient to permit the continued operation of Dunbar without some changes to insure an integrated and unitary school. If this could be accomplished then the high school operation of the Defendants' high school would be on a unitary, Constitutional basis.

■ From the evidence and from the plans suggested by the parties in the evidence, this can probably be accomplished in one of the following ways:

1. Close Lubbock High School and assign its students to the remaining four high schools, which, according to the plan of the Government, would give Dunbar an over-capacity enrollment of 860, of which 500 would be Anglo, 130 Mexican-American and 230 Negro. Admittedly this would make Dunbar a fully-integrated and unitary high school. However, the Defendant School District strongly objects to this plan because the closing of Lubbock High School and the loss of its 2,100 high school student capacity would

cause an over-all shortage in the remaining four high schools of some 500, and such a shortage would create serious problems for the School District, and secondly, there is no need for this building as an administration building for the system since one has recently been purchased and renovated, and further there has been widespread and determined opposition to the closing of this central school system. The opposition does not seem to be that it would cause any mixing of the races but because of the closing of a school in a logical location, with large capacity, excellent facilities, and many other conveniences.

There are other details of this plan but the principal portion would involve the closing of Lubbock High School as well as the adjustment of the lines elsewhere.

2. A change in the school attendance lines for Dunbar and making it a three-grade high school (10–12), as well as resulting changes in the boundary lines of the other school districts to adjust to the change at Dunbar. Basically, the changes at Dunbar would move the west line from Avenues C and A to Avenue Q, and extend it southward to the South Boundary Line of the District. This would give Dunbar 730 students (under its capacity) with 300 Anglos, 130 Mexican-Americans and 300 Negroes. This is in accordance with the exhibit attached to the Complaint. Defendant School District objects to this plan because it does not feel that the extension of the boundary line westward would solve the problem since, from their past experience, they believe it would cause a flight of white families and would not give the desired integration effects at Dunbar. As will be seen later under the discussion on junior high schools, this necessarily causes further change in the school assignment areas of junior high schools since the 9th grade at Dunbar would be removed from the high school system and placed in a junior high school.

3. Another plan would be to close Dunbar and transfer these students to three of the high schools in Lubbock by equal distribution between Lubbock, Coronado and Monterey. Dunbar High School would then be made into either a junior high school or a 9th grade school for that and other adjoining areas. This plan is desirable in that it removes any vestige of a dual system from the Dunbar segregation situation, would successfully integrate Lubbock, Coronado and Monterey High Schools, all of which have insignificant numbers of black students, and would solve the problem of any "flight" that might thwart the efforts of the School Board to create and operate a truly unitary system. There are several drawbacks in that the burden would necessarily fall on the 10th, 11th and 12th grade students at Dunbar, who are essentially all black, and would cause busing of these students to the other three high schools in same instances, and unless careful attention was given would create a segregated school in either the 9th grade or junior high level in the operation of the old Dunbar High School. Another problem is that the enrollment at Dunbar, which is far less than its capacity, and the apparent downward trend of enrollment in Dunbar, indicates that the operation of this high school might not be feasible unless the attendance is increased. Economically and from the standpoint of administration, a high school with this few students would not be the ideal type of operation and its closing would foreclose any of these difficulties. The residents near Dunbar strongly oppose any closing of that school or change from a high school facility.

It is difficult, in the short time allotted to this Court, to determine which of the above three plans, or combination thereof, or perhaps another plan, would be most desirable. The disruption of the 1,700 students at Lubbock High School or even a less disruption of 470 students in number at Dunbar High School by closing either school is certainly not desirable if it can be accomplished in any other feasible manner.

The principal objection that the Court finds to Plan 2 above, which is the extension of Dunbar attendance zones, is that

past experience reveals that "flight" might result, and Dunbar would, within a reasonably short time, again be a totally segregated black school which might still constitute a remaining vestige of the old dual system prior to 1954. However, the Plaintiff has proposed Plan 2 and according to its projections, Dunbar would be converted to a unitary and integrated school with an equal number of Anglo and Negro students and a small number of Mexican-American students and at an enrollment of 730 which would be a much more efficient operation. There are, of course, disadvantages to Plan 2. Although it preserves a neighborhood school system in the high schools of Lubbock, Dunbar High School is located at the extreme north end of its assigned geographical zone. However, the evidence is clear that the black population presently being served by this school, and in fact the center of population of this particular area, even as extended, is in the north part of the zone and the south part is sparsely settled and populated at this time. This plan will avoid the disruption of upwards of 2,000 people in the Dunbar and Lubbock High Schools, if either one or both of them were to be closed or drastically changed. It maintains a geographical and neighborhood school plan as near as is practical under the circumstances. Under the evidence presented and by the tables attached to Plaintiff's Complaint, Dunbar will become a unitary school, and no high school in the Lubbock Independent School District will then have a minority race as a majority of its students. The evidence shows that over the years since Brown I the School Board has enlarged and changed the lines of Dunbar in an attempt to bring in more Anglo students to effect this purpose, and according to the Government's contention this plan, as it is submitted, will accomplish this. It does seem that if it is accomplished and Dunbar becomes an integrated school with no one minority race in predominant attendance, that this should finally dispose of the matter. All vestiges of a de jure segregated school population at Dunbar will be removed by this plan and

it is felt that no further Court action will be required if this, in fact, is accomplished.

The Court will order, in detail, an adoption of this Plan 2 as to the High Schools of the Lubbock Independent School District. *(See a supplemental opinion of this date which will modify this order.)*

## JUNIOR HIGH SCHOOLS

It can be seen that the removal of 9th grade students from Dunbar High School will place an additional load on Struggs Junior High School, which is within a few blocks of Dunbar and is presently operating as a junior high school with 7th and 8th grade pupils. This school was erected in 1965 on a new site with a capacity of 500, but actually it, too, remains as a segregated black school because it in effect took over the grades of 7 and 8 of the old Dunbar operation. So this school, too, is a remainder and vestige of the dual operation in existence prior to 1954 and steps must be taken to alleviate this condition and correct it, even though Struggs is located within the geographical limits of its boundary lines at a point which fairly, adequately and equally serves all of the students within the area. In 1965, when this school was first opened, it was 100% black, and in the 1969–70 school year with a registration of 363, it remained 93.67% Negro, 4.68% Mexican-American and 1.65% Anglo. The surrounding neighborhood conforms with the attendance pattern as to racial context at the junior high school. The solution is not easy and is complicated by the fact that a 9th grade will be added to Struggs Junior High School, if a neighborhood concept is to be considered at all. The Plaintiff suggests that the west boundary line be extended to Avenue H from its present location along Avenues A and C. The Plaintiff has informed this Court, through its pleadings and evidence, that approximately 200 white students presently enrolled at Slaton and Atkins will attend Struggs, which with 363 now in attendance, plus the 9th grad-

ers in the area, will place Struggs considerably over its 500 pupil capacity.

Since Atkins and Slaton Junior High Schools will be relieved of 200 of the 7th and 8th graders, it would seem only reasonable that the 9th graders in the Struggs area should be assigned to these two schools. Further, the North Boundary Line of Struggs Junior High School should be 19th Street from H Avenue eastward to the East Boundary Line of the School District. That area formerly in Struggs, or optional, would be assigned to Alderson as to grades 7, 8 and 9 North of 19th Street and East of the arroyo and the extreme northwest corner of the old Struggs District would be assigned to Thompson as to grades 7, 8 and 9. Again, it is hard to determine what effect this will actually have due to the population shift caused by the May 11, 1970 tornado and due to the fact that the Government's figures are admittedly based on its 1968 survey. However, these are the figures before the Court and the ones it must accept and act on at this time.

This will make Struggs a junior high school accommodating 7th and 8th grade pupils in a geographical area that is uniform in size and shape, and although Struggs is located on the north end of the area, it is almost equi-distant east and west. However, the population is to the north, and according to the information attached to the Plaintiff's Complaint, Struggs will have an enrollment of 490, 110 Anglo, 120 Mexican-American and 260 Negro, which gives it substantial integration, entirely opposite from its present 363 students of whom 93.67% are Negro, 4.68% are Mexican-American, and 1.65% are Anglo.

 No other changes are to be made in the attendance lines of junior high schools, as the Court feels that these boundary lines are fairly drawn without any consideration of assignment by race, are on a geographic zone or neighborhood school basis, and meet the proper criteria of the decisions. It is not alleged that any other junior high school is a remaining vestige of the old dual

system in operation prior to 1954, and the Court finds no evidence that any other junior high schools are violating any decisions of the Courts. In those instances where junior high schools, in the Lubbock Independent School District, are predominantly Mexican-American or predominantly Negro, it is obvious from the evidence that they were not in that situation prior to 1954, and such minority predominance is not created because of any change in boundary lines made by the Defendant School District, or from any other act of the School District, but were solely created by a shifting population. As an example, Alderson, in 1963–1964, after it had opened in 1961, had 79.52% Anglo, 18.74% Mexican-American, and 1.74% Negro, while in 1969–70 with an enrollment of 678 it had 26.11% Anglo, 34.66% Mexican-American and 39.23% Negro. There have been no substantial changes or alterations in the boundary lines of the Alderson Junior High School District since it first opened, and no other acts shown to have been committed by the School Board which would cause this and the only explanation is the shifting of the population as these enrollments have always reflected the residential pattern. Likewise, Matthews Junior High School which was opened in 1952–53 was mostly Anglo. In October of 1964 it had 74% Anglo, 25% Mexican-American and 1% Negro. In 1969–70 it had 24% Anglo, and 76% Mexican-American. Here again there has been no change of significance in the boundary lines that would cause this shift and change in the percentages, and no other act is shown to have been committed by the School Board that would have created this change in percentages, and the only reason assigned is that of a shifting population in the residential area. This holds true for Carroll Thompson and Slaton, these schools all having higher ratios of minority groups than ordinarily might be desirable. However, if they were not in existence prior to Brown I or if the School Board has done nothing to create this imbalance since such date, no action should be taken to alter or change same, because the Courts

have not been authorized by any decision known to this Court to change school attendance zones solely because of a moving population, and absence of State action causing a change from an integrated school.

█ Implementation of the above orders will create a unitary school system for the entire Lubbock Independent School District as to its junior high schools and will remove as segregated schools for minority races any of those schools which have been segregated because of prior law or traditions or because of the acts and conduct of the Defendant School District.

## ELEMENTARY SCHOOLS

The Lubbock Independent School District operates 38 elementary public schools, most of which have grades 1 through 6 on separate campuses, although one has a joint campus with a junior high school. The evidence and contentions in this suit do not reveal any trace of a dual school system, prohibited by the Constitution, as being present in 20 of these schools. There was evidence before the Court that the remaining 18 elementary schools have a racial composition in which the Anglo-Americans are 50% or less and the other one-half or more of the population is either totally all black, all Mexican-American, or a mixture of the two, and in several cases 100% black and 100% Mexican-American.

Twelve of these 18 schools, with less than 50% as Anglo-American, are in a similar category. As an example, Arnett Elementary School was built in 1954 for a predominantly Anglo-American neighborhood. In March, 1964, the composition of the student body was 83.84% Anglo-American, 16.16% Mexican-American, and no blacks. It is now less than one-half Anglo-American, while the remaining students are Mexican-American. Carter Elementary School has been operated for many years as a predominantly Anglo-American school but now is over 83% Mexican-American. McWhorter Elementary School was pre-dominantly Anglo-American in 1954, but now it is over 80% Mexican-American. Another example is Wolffarth Elementary School which had over one-half Anglo-American in 1964, and now is 17% Anglo-American and 82+% Mexican-American.

The 12 schools, of which the above are examples, are elementary schools that were established either before 1954, or since such date, at a time to serve a population that was predominantly Anglo-American. Since the opening of these schools, population shifts have occurred to a point where these 12 schools are no longer predominantly Anglo-American, but in fact Anglo-Americans are in the minority and either blacks or Mexican-Americans, or a combination thereof, now constitute a majority in these schools. Although these schools might be suspect as presently being unconstitutional because of a predominant minority race in its enrollment, I do not find any remaining vestige of a school which had formerly been segregated by law. Residential patterns and a shifting population are the only causes of their present racial mixture.

█ The Lubbock Independent School District has consistently followed a policy of having the elementary school serve approximately equal areas in Lubbock, consisting, where possible, of one square mile, and there is no evidence that the School Board has changed the boundary lines or done anything else to alter or change the composition of the student body of these schools by changing such boundary lines. The change in percentages from Anglo-American to Mexican-American or Negro has been caused solely by a shift in the population of the City of Lubbock during its rapid growth. The Court does not find these 12 schools are operated in an illegal manner or that there is a remaining vestige of an illegally operated dual system, as these schools just do not fit into this prohibited classification.

The other 6 elementary schools in Lubbock may present a different problem. It is these 6 schools that were es-

pecially referred to by the Plaintiff in its Complaint as being evidences of a remaining vestige of the old dual system. It would be best to examine these somewhat in detail, as all of them were specifically pointed out in the attachments to Plaintiff's Complaint:

1. Martin Elementary School: In October, 1969, it had a student body of 34.13% Mexican-American, 65.19% Negroes and 0.68% Anglo-American. This school was built in 1961 for a projected student body that would be predominantly Negro and Mexican-American and it has remained that way to this day. The School District built Martin School in an area where a minority race was predominant and a segregated situation resulted, but if it had not been built in a segregated residential area it could have been avoided, but the School Board was only carrying out its policy of neighborhood schools in its elementary system, especially with regard to the area to be served of one square mile per school.

2. Posey Elementary School: In October, 1969, the student body at this school was 0.77% Anglo-American, 34.-99% Mexican-American, and 64.24% Negro. The school was built in 1949 and in 1954 its student body was predominantly Anglo-American, and there was no segregation in effect at Posey at this time. I do not find, as the Plaintiff contends, that this school was created to further segregation, but in my opinion it should be added to the classification of the 12 above, as it was a shift in population that caused the changes here.

3. Wheatley Elementary School: In October, 1969, Wheatley was 100% Negro. This school was built in 1946 for a projected student body that would be wholly Negro, and the construction of this school in this location, similar to that of Martin, perpetuated a segregated system that existed in this area at that time and has continued to exist since Brown I.

4. Ella Isles Elementary School: In October, 1969, the registration of students at this school showed 99.74% Ne-

gro. It was first built in 1935, although with subsequent additions in 1939, 1944, 1948, 1952 and 1959. It was wholly black in 1954 and has remained so ever since. Isles existed as part of the dual system prior to 1954 and constitutes a remaining vestige of an illegally constituted and operated elementary school as to race composition.

5. Guadalupe Elementary School: In October, 1969, this school was 100% Mexican-American and was built in 1961 for a projected student body that would be overwhelmingly Mexican-American. It was built in the area of two other schools, elementary as to grade, and which also had a predominantly Mexican-American population. This, too, fails the test, as it was built in an area and place that fostered and supported segregation rather than integration.

6. Sanders Elementary School: In October, 1969, there were 3.86% Anglo-Americans registered, 68.04% Mexican-Americans registered, and 28.10% Negroes registered. This school was built in 1925 and in 1954 its student body was predominantly Mexican-American. This school is in the same factual situation as Wheatley, above, and was a part of the illegally operated dual system in 1954 and remains that way to this day.

I have named the above 6 schools specifically as they are the ones pointed out by Plaintiff's Complaint as being those which contain visible evidence of the remaining vestige of the dual structure which had previously existed. Although all of them may not fit strictly into this category, and even though there might be other schools out of the 12 above mentioned that might conceivably fall in this category, the discussion given above is sufficient for the decision that the Court has reached in this respect.

The Government has suggested several alternative proposals to fully integrate the questioned schools. These proposals involve closing some of the schools and pairing.

However, the witness of the Government, Dr. Bell, an expert in educational

affairs, testified that his plans would involve increased travel for the students and further, that many of them would be required to pass by a school they had previously attended, which had either been closed or paired, in order to reach schools to which they had been assigned under his plans. There is a dispute in the evidence as to the hazards facing students that would result from these changes, and although this is not at all a controlling factor with this Court, the existence of such traffic hazards is noted.

■ After examining all of the facts carefully regarding these elementary schools this Court is of the opinion that Hightower v. West, 430 F.2d 552 (5th Cir. 1970) is controlling here. I agree that in the elementary schools of Lubbock that each child should attend the school nearest his home rather than traveling past it to another school and I cannot approve of the Government's proposed remedies in this area. The Lubbock Independent School District has made every reasonable effort to maintain its elementary schools on a reasonable and proper geographical zoning basis, without variance. It should also be noted as in *Hightower,* and under the order to be entered concerning the junior high schools and high schools, that each Negro and Mexican-American student will, during his secondary school career, be exposed to a fully-integrated and unitary school, especially in the junior high school and senior high school level.

The School Board's policy zones these elementary schools so that, in most instances, no student is more than one mile from his school of attendance and new construction is attempted to be made at lines that are equi-distant between schools with a minimum of attention being given to natural barriers. Under these circumstances, the Court is of the firm opinion that the present system at the elementary level in Lubbock is permissible and will not be disturbed, even though it is recognized that some all-Negro elementary schools or all-Mexi-can-American elementary schools still remain.

## STAFF AND FACULTY

Further, with respect to the composition of the staff and the teaching faculty of the Lubbock Independent School District, the Court recognizes that the changes to be ordered will necessarily require different teaching and perhaps different staff assignments. At this time there is not sufficient factual evidence before this Court for the Court to determine whether or not the ratio of the assignments to the various schools meets the requirements of law. The Court will order that the Defendant School District report to the Court on or before October 1, 1970, its information as to the assignments of faculty and staff as to race in order that the Court can determine whether or not they meet the requirements of Singleton v. Jackson et al., 419 F.2d 1211 (5th Cir., opinion dated December 1, 1969). This is further order on this question at this recent storm in Lubbock will require different evaluations as to these assignments and the Court will not make any further order on this question at this time although jurisdiction will be retained as to all questions in this suit.

This opinion will constitute the Findings of Fact and Conclusions of Law by this Court in support of the order issued herein on August 22, 1970. But, the Court does here adopt as a part of its Findings of Fact the Government's Exhibit No. 1 and also the tables attached to and made a part of the study of the Lubbock School System which was attached to the Plaintiff's Complaint. Further, if any facts are not specifically found in this memorandum opinion, reference is made to the exhibits on file which are here adopted and found in further support of the order entered on August 22, 1970. There was very little dispute as to the factual data before the Court, and the Court is of the opinion that the Order entered on August 22, 1970, is fully supported by the facts as here found and those appearing in the record.

## SUPPLEMENTAL OPINION

Lubbock presents a unique fact situation in the operation of its school system—it is composed of an old de jure school operation such as Dunbar and it has several schools, mainly elementary, that have segregated minority races as the major enrollment, yet these de facto schools are not segregated because of State action.

The hearing held last week on the merits, although fully developed by able and competent counsel for each side, was held with a minimum of notice due to the proximity of school's opening. As a fact, the Government's statistics were based on a 1968 survey and in some instances bore only a slight resemblance to the picture in 1970. But this was the evidence upon which the Court based its order of August 22, 1970.

It was only to be expected that one party or the other would desire to present additional evidence after the close of the trial, and this the Defendant School Board has done by a sworn motion to amend this Court's order of August 22, 1970, and the Court has permitted the filing of and the Court has duly considered said motion in Conference attended by an Assistant United States Attorney, the attorneys for the Defendant School Board and representatives of the Board.

This Court, in addition to its original Memorandum Opinion and in addition to its factual findings contained in the orders of this Court (August 22nd and August 24th, 1970) makes additional Findings of Fact and Conclusions of Law in support of said order:

The School Board has now made an actual count of the students by race and grade that would be effected by the original order of August 22, 1970.

It now appears that the high school student capacity of Dunbar is only 639 students instead of 773. This is due to physical changes in the classroom structures and it is now far too late in the year to alter these further. These changes were made only after the De-

partment of Health, Education and Welfare, through its hearing examiner, approved of the District's plan of operation and before the filing of this suit.

There will be 367 students (mostly black) registering in Dunbar this year in grades 10, 11 and 12. These students are residents of the old Dunbar School Zone.

The order of the Court would have transferred a total of 447 students, 82 Mexican-American and 365 Anglo-American—more than estimated by the Government's witness who used 1968 statistics, and would place 814 students in a high school with a capacity of only 639.

Capacity is a variance allowed by the Courts to permit students living in one zone to attend school in another. Ellis et al v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203 (5th Cir. 1970).

Hence the Court finds that under these facts that the 122 senior students (12th grade) transferred to the Dunbar High School by its previous order, will not be transferred and these 12th grade students will attend the high school in which they would have otherwise enrolled.

Although the Plaintiff, after consultation by the Assistant United States Attorney with the appropriate Civil Rights attorney of the Department of Justice in Washington, protests the above change, it offered no opposition to the following:

1. The optional zone between Estacado and Lubbock High, North of Erskine Road, will remain optional as no objection has been directed towards Estacado as a segregated facility and this change will have no effect on the racial balance at Dunbar.

2. Students who last spring enrolled for courses that are not offered at Dunbar may elect to re-register in their old high school. To have offered these special courses for these students at Dunbar would have caused classes of very few pupils—even less than five—which

would further decrease the capacity of Dunbar.

It appears that these changes will still result in an enrollment of 263 Anglos and 82 Mexican-Americans at Dunbar, remove severe hardships and relieve the overcrowding that would have otherwise resulted at Dunbar.

An order of August 24, 1970, has been entered accordingly granting the Motion.