# GREEN ET AL. *v.* COUNTY SCHOOL BOARD OF NEW KENT COUNTY ET AL.

No. 695.  Argued April 3, 1968.—Decided May 27, 1968.

*Samuel W. Tucker* and *Jack Greenberg* argued the cause for petitioners. With them on the brief were *James M. Nabrit III, Henry L. Marsh III,* and *Michael Meltsner.*

*Frederick T. Gray* argued the cause for respondents. With him on the brief were *Robert Y. Button,* Attorney General of Virginia, *Robert D. McIlwaine III,* First Assistant Attorney General, and *Walter E. Rogers.*

*Louis F. Claiborne* argued the cause for the United States, as *amicus curiae.* With him on the brief were *Solicitor General Griswold, Assistant Attorney General Pollak, Lawrence G. Wallace,* and *Brian K. Landsberg.*

*Joseph B. Robison* filed a brief for the American Jewish Congress, as *amicus curiae,* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision is whether, under all the circumstances here, respondent School Board's adoption of a "freedom-of-choice" plan which allows a pupil to choose

his own public school constitutes adequate compliance with the Board's responsibility "to achieve a system of determining admission to the public schools on a non-racial basis . . . ." *Brown* v. *Board of Education,* 349 U. S. 294, 300–301 *(Brown II).*

Petitioners brought this action in March 1965 seeking injunctive relief against respondent's continued maintenance of an alleged racially segregated school system. New Kent County is a rural county in Eastern Virginia. About one-half of its population of some 4,500 are Negroes. There is no residential segregation in the county; persons of both races reside throughout. The school system has only two schools, the New Kent school on the east side of the county and the George W. Watkins school on the west side. In a memorandum filed May 17, 1966, the District Court found that the "school system serves approximately 1,300 pupils, of which 740 are Negro and 550 are White. The School Board operates one white combined elementary and high school [New Kent], and one Negro combined elementary and high school [George W. Watkins]. There are no attendance zones. Each school serves the entire county." The record indicates that 21 school buses—11 serving the Watkins school and 10 serving the New Kent school—travel overlapping routes throughout the county to transport pupils to and from the two schools.

The segregated system was initially established and maintained under the compulsion of Virginia constitutional and statutory provisions mandating racial segregation in public education, Va. Const., Art. IX, § 140 (1902); Va. Code § 22–221 (1950). These provisions were held to violate the Federal Constitution in *Davis* v. *County School Board of Prince Edward County,* decided with *Brown* v. *Board of Education,* 347 U. S. 483, 487 *(Brown I).* The respondent School Board continued the segregated operation of the system after the *Brown*

decisions, presumably on the authority of several statutes enacted by Virginia in resistance to those decisions. Some of these statutes were held to be unconstitutional on their face or as applied.[1] One statute, the Pupil Placement Act, Va. Code § 22–232.1 *et seq.* (1964), not repealed until 1966, divested local boards of authority to assign children to particular schools and placed that authority in a State Pupil Placement Board. Under that Act children were each year automatically reassigned to the school previously attended unless upon their application the State Board assigned them to another school; students seeking enrollment for the first time were also assigned at the discretion of the State Board. To September 1964, no Negro pupil had applied for admission to the New Kent school under this statute and no white pupil had applied for admission to the Watkins school.

The School Board initially sought dismissal of this suit on the ground that petitioners had failed to apply to the State Board for assignment to New Kent school. However on August 2, 1965, five months after the suit was brought, respondent School Board, in order to remain eligible for federal financial aid, adopted a "freedom-of-choice" plan for desegregating the schools.[2] Under that

---

[1] *E. g., Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218; *Green* v. *School Board of City of Roanoke,* 304 F. 2d 118 (C. A. 4th Cir. 1962); *Adkins* v. *School Board of City of Newport News,* 148 F. Supp. 430 (D. C. E. D. Va.), aff'd, 246 F. 2d 325 (C. A. 4th Cir. 1957); *James* v. *Almond,* 170 F. Supp. 331 (D. C. E. D. Va. 1959); *Harrison* v. *Day,* 200 Va. 439, 106 S. E. 2d 636 (1959).

[2] Congress, concerned with the lack of progress in school desegregation, included provisions in the Civil Rights Act of 1964 to deal with the problem through various agencies of the Federal Government. 78 Stat. 246, 252, 266, 42 U. S. C. §§ 2000c *et seq.,* 2000d *et seq.,* 2000h–2. In Title VI Congress declared that

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied

plan, each pupil, except those entering the first and eighth grades, may annually choose between the New Kent and Watkins schools and pupils not making a choice are assigned to the school previously attended; first and eighth grade pupils must affirmatively choose a school. After the plan was filed the District Court denied petitioners' prayer for an injunction and granted respondent leave to submit an amendment to the plan with respect to employment and assignment of teachers and staff on a racially nondiscriminatory basis. The amendment was duly filed and on June 28, 1966, the District Court approved the "freedom-of-choice" plan as so amended. The Court of Appeals for the Fourth Circuit, *en banc,* 382 F. 2d 338,[3] affirmed the District Court's approval of the "freedom-of-choice" provisions of the plan but remanded the case to the District Court for entry of an order regarding faculty

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U. S. C. § 2000d.

The Department of Health, Education, and Welfare issued regulations covering racial discrimination in federally aided school systems, as directed by 42 U. S. C. § 2000d–1, and in a statement of policies, or "guidelines," the Department's Office of Education established standards according to which school systems in the process of desegregation can remain qualified for federal funds. 45 CFR §§ 80.1–80.13, 181.1–181.76 (1967). "Freedom-of-choice" plans are among those considered acceptable, so long as in operation such a plan proves effective. 45 CFR § 181.54. The regulations provide that a school system "subject to a final order of a court of the United States for the desegregation of such school . . . system" with which the system agrees to comply is deemed to be in compliance with the statute and regulations. 45 CFR § 80.4 (c). See also 45 CFR § 181.6. See generally Dunn, Title VI, the Guidelines and School Desegregation in the South, 53 Va. L. Rev. 42 (1967); Note, 55 Geo. L. J. 325 (1966); Comment, 77 Yale L. J. 321 (1967).

[3] This case was decided *per curiam* on the basis of the opinion in *Bowman* v. *County School Board of Charles City County,* 382 F. 2d 326, decided the same day. Certiorari has not been sought for the *Bowman* case itself.

"which is much more specific and more comprehensive" and which would incorporate in addition to a "minimal, objective time table" some of the faculty provisions of the decree entered by the Court of Appeals for the Fifth Circuit in *United States* v. *Jefferson County Board of Education*, 372 F. 2d 836, aff'd *en banc*, 380 F. 2d 385 (1967). Judges Sobeloff and Winter concurred with the remand on the teacher issue but otherwise disagreed, expressing the view "that the District Court should be directed . . . also to set up procedures for periodically evaluating the effectiveness of the [Board's] 'freedom of choice' [plan] in the elimination of other features of a segregated school system." *Bowman* v. *County School Board of Charles City County*, 382 F. 2d 326, at 330. We granted certiorari, 389 U. S. 1003.

The pattern of separate "white" and "Negro" schools in the New Kent County school system established under compulsion of state laws is precisely the pattern of segregation to which *Brown I* and *Brown II* were particularly addressed, and which *Brown I* declared unconstitutionally denied Negro school children equal protection of the laws. Racial identification of the system's schools was complete, extending not just to the composition of student bodies at the two schools but to every facet of school operations—faculty, staff, transportation, extracurricular activities and facilities. In short, the State, acting through the local school board and school officials, organized and operated a dual system, part "white" and part "Negro."

It was such dual systems that 14 years ago *Brown I* held unconstitutional and a year later *Brown II* held must be abolished; school boards operating such school systems were *required* by *Brown II* "to effectuate a transition to a racially nondiscriminatory school system." 349 U. S., at 301. It is of course true that for the time immediately after *Brown II* the concern was with making an initial break in a long-established pattern of excluding

Negro children from schools attended by white children. The principal focus was on obtaining for those Negro children courageous enough to break with tradition a place in the "white" schools. See, *e. g., Cooper* v. *Aaron,* 358 U. S. 1. Under *Brown II* that immediate goal was only the first step, however. The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about; it was because of the "complexities arising from the transition to a system of public education freed of racial discrimination" that we provided for "all deliberate speed" in the implementation of the principles of *Brown I.* 349 U. S., at 299–301. Thus we recognized the task would necessarily involve solution of "varied local school problems." *Id.,* at 299. In referring to the "personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis," we also noted that "[t]o effectuate this interest may call for elimination of a variety of obstacles in making the transition . . . ." *Id.,* at 300. Yet we emphasized that the constitutional rights of Negro children required school officials to bear the burden of establishing that additional time to carry out the ruling in an effective manner "is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date." *Ibid.* We charged the district courts in their review of particular situations to

> "consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the

defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system." *Id.,* at 300–301.

It is against this background that 13 years after *Brown II* commanded the abolition of dual systems we must measure the effectiveness of respondent School Board's "freedom-of-choice" plan to achieve that end. The School Board contends that it has fully discharged its obligation by adopting a plan by which every student, regardless of race, may "freely" choose the school he will attend. The Board attempts to cast the issue in its broadest form by arguing that its "freedom-of-choice" plan may be faulted only by reading the Fourteenth Amendment as universally requiring "compulsory integration," a reading it insists the wording of the Amendment will not support. But that argument ignores the thrust of *Brown II*. In the light of the command of that case, what is involved here is the question whether the Board has achieved the "racially nondiscriminatory school system" *Brown II* held must be effectuated in order to remedy the established unconstitutional deficiencies of its segregated system. In the context of the state-imposed segregated pattern of long standing, the fact that in 1965 the Board opened the doors of the former "white" school to Negro children and of the "Negro" school to white children merely begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system. *Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to

convert to a unitary system in which racial discrimination would be eliminated root and branch. See *Cooper* v. *Aaron, supra,* at 7; *Bradley* v. *School Board,* 382 U. S. 103; cf. *Watson* v. *City of Memphis,* 373 U. S. 526. The constitutional rights of Negro school children articulated in *Brown I* permit no less than this; and it was to this end that *Brown II* commanded school boards to bend their efforts.[4]

In determining whether respondent School Board met that command by adopting its "freedom-of-choice" plan, it is relevant that this first step did not come until some 11 years after *Brown I* was decided and 10 years after *Brown II* directed the making of a "prompt and reasonable start." This deliberate perpetuation of the unconstitutional dual system can only have compounded the harm of such a system. Such delays are no longer tolerable, for "the governing constitutional principles no longer bear the imprint of newly enunciated doctrine." *Watson* v. *City of Memphis, supra,* at 529; see *Bradley* v. *School Board, supra; Rogers* v. *Paul,* 382 U. S. 198. Moreover, a plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. "The time for mere 'deliberate speed' has run out," *Griffin* v. *County School Board,* 377 U. S. 218, 234; "the context in which we must interpret and apply this language [of *Brown II*] to plans for desegregation has been significantly altered."

---

[4] "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana* v. *United States,* 380 U. S. 145, 154. Compare the remedies discussed in, *e. g., NLRB* v. *Newport News Shipbuilding & Dry Dock Co.,* 308 U. S. 241; *United States* v. *Crescent Amusement Co.,* 323 U. S. 173; *Standard Oil Co.* v. *United States,* 221 U. S. 1. See also *Griffin* v. *County School Board,* 377 U. S. 218, 232–234.

*Goss* v. *Board of Education,* 373 U. S. 683, 689. See *Calhoun* v. *Latimer,* 377 U. S. 263. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now.*

The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system "at the earliest practicable date," then the plan may be said to provide effective relief. Of course, the availability to the board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method. Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed. See No. 805, *Raney* v. *Board of Education, post,* at 449.

We do not hold that "freedom of choice" can have no place in such a plan. We do not hold that a "freedom-of-choice" plan might of itself be unconstitutional, although that argument has been urged upon us. Rather,

all we decide today is that in desegregating a dual system a plan utilizing "freedom of choice" is not an end in itself. As Judge Sobeloff has put it,

> " 'Freedom of choice' is not a sacred talisman; it is only a means to a constitutionally required end—the abolition of the system of segregation and its effects.  If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end.  The school officials have the continuing duty to take whatever action may be necessary to create a 'unitary, non-racial system.' "  *Bowman* v. *County School Board,* 382 F. 2d 326, 333 (C. A. 4th Cir. 1967) (concurring opinion).

Accord, *Kemp* v. *Beasley,* 389 F. 2d 178 (C. A. 8th Cir. 1968); *United States* v. *Jefferson County Board of Education, supra.*  Although the general experience under "freedom of choice" to date has been such as to indicate its ineffectiveness as a tool of desegregation,[5] there may well be instances in which it can serve as an effective device.  Where it offers real promise of aiding a deseg-

---

[5] The views of the United States Commission on Civil Rights, which we neither adopt nor refuse to adopt, are as follows:

"Freedom of choice plans, which have tended to perpetuate racially identifiable schools in the Southern and border States, require affirmative action by both Negro and white parents and pupils before such disestablishment can be achieved.  There are a number of factors which have prevented such affirmative action by substantial numbers of parents and pupils of both races:

"(a) Fear of retaliation and hostility from the white community continue to deter many Negro families from choosing formerly all-white schools;

"(b) During the past school year [1966–1967], as in the previous year, in some areas of the South, Negro families with children attending previously all-white schools under free choice plans were targets of violence, threats of violence and economic reprisal by white persons and Negro children were subjected to harassment by white

regation program to effectuate conversion of a state-imposed dual system to a unitary, nonracial system there might be no objection to allowing such a device to prove itself in operation. On the other hand, if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, "freedom of choice" must be held unacceptable.

The New Kent School Board's "freedom-of-choice" plan cannot be accepted as a sufficient step to "effectuate a transition" to a unitary system. In three years of operation not a single white child has chosen to attend Watkins school and although 115 Negro children enrolled in New Kent school in 1967 (up from 35 in 1965 and 111 in 1966) 85% of the Negro children in the system still attend the all-Negro Watkins school. In other words, the school system remains a dual system. Rather than further the dismantling of the dual system, the plan has operated simply to burden children and their parents

classmates notwithstanding conscientious efforts by many teachers and principals to prevent such misconduct;

"(c) During the past school year, in some areas of the South public officials improperly influenced Negro families to keep their children in Negro schools and excluded Negro children attending formerly all-white schools from official functions;

"(d) Poverty deters many Negro families in the South from choosing formerly all-white schools. Some Negro parents are embarrassed to permit their children to attend such schools without suitable clothing. In some districts special fees are assessed for courses which are available only in the white schools;

"(e) Improvements in facilities and equipment . . . have been instituted in all-Negro schools in some school districts in a manner that tends to discourage Negroes from selecting white schools."

Southern School Desegregation, 1966–1967, at 88 (1967). See id., at 45–69; Survey of School Desegregation in the Southern and Border States 1965–1966, at 30–44, 51–52 (U. S. Comm'n on Civil Rights 1966).

with a responsibility which *Brown II* placed squarely on the School Board. The Board must be required to formulate a new plan and, in light of other courses which appear open to the Board, such as zoning,[6] fashion steps which promise realistically to convert promptly to a system without a "white" school and a "Negro" school, but just schools.

The judgment of the Court of Appeals is vacated insofar as it affirmed the District Court and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

---

[6] "In view of the situation found in New Kent County, where there is no residential segregation, the elimination of the dual school system and the establishment of a 'unitary, non-racial system' could be readily achieved with a minimum of administrative difficulty by means of geographic zoning—simply by assigning students living in the eastern half of the county to the New Kent School and those living in the western half of the county to the Watkins School. Although a geographical formula is not universally appropriate, it is evident that here the Board, by separately busing Negro children across the entire county to the 'Negro' school, and the white children to the 'white' school, is deliberately maintaining a segregated system which would vanish with non-racial geographic zoning. The conditions in this county present a classical case for this expedient." *Bowman* v. *County School Board, supra,* n. 3, at 332 (concurring opinion).

Petitioners have also suggested that the Board could consolidate the two schools, one site (*e. g.,* Watkins) serving grades 1–7 and the other (*e. g.,* New Kent) serving grades 8–12, this being the grade division respondent makes between elementary and secondary levels. Petitioners contend this would result in a more efficient system by eliminating costly duplication in this relatively small district while at the same time achieving immediate dismantling of the dual system.

These are two suggestions the District Court should take into account upon remand, along with any other proposed alternatives and in light of considerations respecting other aspects of the school system such as the matter of faculty and staff desegregation remanded to the court by the Court of Appeals.