Karen Renee AUGUSTUS, a minor, by Charles A. Augustus, her father and next friend, et al., Plaintiffs,

v.

The SCHOOL BOARD OF ESCAMBIA COUNTY, FLORIDA, et al., Defendants.

No. PCA 1064.

United States District Court
N. D. Florida,
Pensacola Division.

April 21, 1969.

See also, D.C., 299 F.Supp. 1067.

Theodore R. Bowers, Panama City, Fla., and William L. Robinson, New York City, for plaintiffs.

J. E. Holsberry, Pensacola, Fla., for defendants.

S. Gunter Toney, Tallahassee, Fla., for petitioners for intervention.

### ORDER

ARNOW, District Judge.

At the outset, it should be noted defendants, at the Court's request, have filed in this cause, on April 18, 1969, an amended plan of desegregation, and that is the plan considered and referred to by the Court in this order.

This was requested, and done, for easy reference. The plan originally prepared had been amended and at the hearing some further matters were stipulated. The plan filed on April 18, 1969, places in one instrument the original plan of the board with these changes.

The plan left for the Court's decision whether Brown-Barge and Semmes schools will be paired. Under the law, the board's duty, when confronted with two reasonable alternatives, is to adopt that one tending most to promote integration and pairing these schools will best accomplish that. The objection largely is because · of traffic hazards, yet no evidence was presented showing that traffic hazards in the past had stood in the way of segregated schools. Such may not be now used to prevent desegregation. Henry v. Clarksdale Separate Municipal School District, 5 Cir., 1969, 409 F.2d 682. In addition, the evidence shows the board will, in this zone, transport the children through the hazardous areas. It follows the board should and will be required to follow its original plan of pairing these two schools.

Under the plan submitted, there will be, next year, no schools attended solely by Negro students, and there will be substantial integration of students and faculties. It meets, in these respects, the test prescribed in *Henry*.

That there will be some 20 or 21 schools in which there is little or no integration gives concern. But it appears, and the Court finds, this results from population location and from natural and geographic, rather than historical, boundaries.

By resorting to expensive bussing, the imbalance in these schools might be eliminated. In addition, the possibility expressed by some that this plan will result in wholesale exodus by affected parents from zoned areas, particularly in downtown Pensacola, might be obviated, and perhaps better educational balance might be attained, by such wholesale bussing.

But these defendants are in an economic strait jacket. The people of this county, two years ago, refused to give them, in a millage election, additional operational funds. No bond issue has been recently adopted; if one were adopted (and there is no assurance one will be) it would be at least two years before funds would be available from it. Testimony at the hearing establishes this county now pays its beginning teachers smaller salaries than all but a few of the counties in Florida, and less than neighboring and nearby counties with which it competes for teachers. Unlike other counties confronted with this problem, it has no monies available from recently-passed bond issues, and has no surplus monies it may use to aid it with its problem. And like them, its pupil load and its need of funds increases. Its pupil population has increased from approximately 39,000 to approximately 46,000 in the eight years this suit has been pending, and indications are that the growth will continue at an even greater rate.*

There is included in the plan a majority-to-minority transfer provision, which must be broadened. Under the plan, also, the faculty will be so desegregated that no school is identifiable as being tailored for a heavy concentration of Negro or white students. These provisions may improve the situation in these schools.

The plan does give realistic and meaningful promise of a unitary school system effective now—it thus complies with Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Because it does, and because of these other considerations, it should be approved in its overall aspect, with only the alterations, changes and additional matters set forth in this order made a part of it.

This is not to say it has the stamp of finality upon it—it may need further examination and rearrangement from time to time. Its proof as a plan legally complying with the law must depend on its actual results. The only desegregation plan that meets constitutional standards, is one that works. United States v. Jefferson County etc., 372 F.2d 836 (5 Cir. 1966). If, for example, the exodus feared by some results, the board, in order to comply with its mandatory obligation to provide a unitary school system, may be required to go to the expense of massive bussing, even though it might mean funds badly needed for other educational purposes are diverted from them. Hopefully, that will not result.

Nor, for that matter, will this Court accept as credible and believable the possibility that the white citizens of Pensacola will engage in such wholesale exodus.

In United States v. Indianola Municipal Separate School District, 5 Cir., 1969, 410 F.2d 626, the argument was made that the requirements imposed would result in wholesale withdrawal of white citizens from the public school system. In response, the panel of judges—all in this case residents of Florida—had this to say:

"The principal answer to these speculations is that those who disagree with constitutional imperatives cannot avoid their application. Monroe v. Board of Commissioners of City of Jackson, Tenn., et al., supra, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, note 3, at 739. Our system of a government of laws surely could not survive if it were otherwise. Further, there is no competent evidence and can be none as to the vitality of this school district op-

---

* Recent studies show that northwest Florida, like all of Florida, has in the past ten years exceeded the national average in rate of population growth, and that it can expect accelerated population growth in the next ten years. The increase for the next ten years for the 18 counties of northwest Florida included in the study is estimated at nearly 20%; Escambia County, which has almost 30% of the total population of these counties, may expect a major portion of that growth.

erating under constitutional principles, since the district has not yet attempted full compliance with these principles. The attitudes of individuals and regions can be changed by persuasion and logic. We are not convinced that the white residents of Indianola or any city wherever located would choose the destruction of their school system over its compliance with constitutional mandates."

With the reasoning of those judges this Court agrees and believes, from everything seen and learned of the people of Pensacola in fifteen months' residence among them, such is particularly applicable here. This Court is not convinced, and simply does not believe, the white residents of Pensacola would choose to destroy or seriously endanger their school system over its compliance with constitutional mandates.

There have been suggestions made at the hearing, and through various ones seeking appearance as amicus curiae, respecting changes. Some, and indeed all, of these may have merit. But the school authorities, confronted with the task of implementing this plan before next September, should not be required to delay adoption of a plan pending further consideration of these suggestions. They should, and will be, required to give consideration to all these and any other suggestions, and any other changes that might be brought to light in their implementation of, and their continuing study of, this plan, and place into effect any complying with this order that hasten and further the attainment of a completely unitary school system in the most practicable and economically feasible way possible as promptly after this date as reasonably they can. Any such changes they may be able to consider, and that comply with the requirements of this order, should be placed in effect before the next school year, if such reasonably may be done.

As a result of these proceedings, the people who live in this county—the school administrators, the teachers, and especially the students and their parents —will from today be entering a changed pattern in their school system. It will not be easy to adjust to this change. It will take time for the school authorities to define exactly the geographic lines that separate the several school zones following the rulings this Court makes today.

Parents will be helpful if they hold up any inquiries about their children for at least two weeks, unless immediate information is essential, according to the superintendent, so the Court is advised. By that time, the principal of each school will know where the pupils now attending his school will be going next September. Reports filed in these proceedings indicate there will be approximately 47,000 students to be accommodated in the more than 60 public schools of the county. It is the responsibility of the school board to assign these boys and girls in accordance with the rulings of the Court. They have an equal responsibility in the assignment of the teaching staff.

All concerned here deal with important fundamental principles. Overriding all other considerations is the rule of law—for our nation to survive, much less to progress, we must have obedience to law. And the law here requires drastic changes in this county's educational system. Compliance with the law must be recognized by all concerned as paramount.

But there also should and must be recognized that we deal here with the future welfare and progress of our nation, because we deal with our children, in whose hands its future lies. In a world that has made and is making more technological and scientific progress in the years of this century than it has in all the prior known centuries of the history of man, increased knowledge and better education for our children, who must outstrip their elders, is imperative.

The board and the superintendent, and all school personnel working with them, have a difficult task. Within the framework of the law, and with limited funds, they must strive to attain the goal of

providing the children of this county now in our schools, and those who come after them, with the highest possible quality education. If the parents, school patrons and all others interested will close ranks behind and with them, in pursuit of that common goal, then, from the turmoil and stress of this period of drastic change in the county's school system, will come a better education for all our county's children, and so a better county, a better state, a better nation.

It is therefore

Ordered:

1. The decree dated April 14, 1967, of this Court prescribing a desegregation plan for the defendants to follow is hereby vacated and set aside.

2. The amended plan filed by defendants in this cause on April 18, 1969, is changed, altered, amended and enlarged in the following particulars and to the following extent:

(a) The Brown-Barge and Semmes schools will be paired in the manner originally contemplated and proposed by defendants, with the zone for these two paired schools being that shown in black on the map marked Exhibit "EC–2".

(b) Defendants will give consideration to suggestions made at and prior to the hearing on April 10, 1969, by T. Roland Brown and wife, respecting zone changes, and by parents as amicus curiae, respecting changes in the Tate-Woodham zone lines, to other suggestions made at the hearing respecting zone changes, and to other possible changes that might be suggested to them or of which they may become aware through further study of the plan proposed by them that might hasten and further the attainment of a completely unitary school system, and shall do so as promptly after this date as reasonably they can. Any such changes they find, after consideration, will accomplish such, and are practicable and economically feasible, may be made by them in consultation with, and with the approval of, the Florida School Desegregation Center.

(c) No later than November 1 of each year, commencing with the year 1969, defendants shall serve upon opposing parties and file with the Court written reports showing and tabulating by race and number the pupil enrollment and faculty assignment in each school in the county for the then current school year. Duplicates of any report filed by the defendants with any government agency containing this information will be acceptable.

(d) The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating all vestiges of the dual system.

(e) In view of the possibility that, in haste of preparation of these zone lines, obvious errors may have occurred that on further examination may be discovered, defendants may change such zone lines to correct such errors, provided that such changes are consistent with the attainment now of a completely unitary school system, and provided also such changes are made in consultation with, and with the approval of, the Florida School Desegregation Center.

(f) The beginning paragraph of item or section 9 of the board's amended plan, being the item or section dealing with majority to minority transfer, is changed to read as follows:

9. Any student who will attend a school in the 1969–70 school year where that student's race in that school will be in the majority according to the board's estimate contained in the amended plan adopted April 17, 1969, may transfer to any other school in which that student's race will be in the minority for the 1969–70 school year according to such estimate, and thereafter any student may transfer from any school in which such student's race is in a majority to any school in which that student's race is

in a minority, upon the following conditions:

The conditions in this item or section 9 of the board's amended plan designated as A, B, C and D remain unchanged and applicable.

(g) There is added to the board's amended plan the following item or section:

9(a). Any student who will attend a school in the 1969–70 school year where that student's race in that school will be in the majority according to the board's estimate contained in the amended plan adopted April 17, 1969, may be by the board assigned to any other school in which that student's race will be in the minority for the 1969–70 school year according to such estimate, and thereafter may assign any student from any school in which such student's race is in a majority to any school in which that student's race is in a minority.

3. The amended plan herein filed by these defendants on April 18, 1969, as changed, altered, amended and enlarged by this order, is approved by the Court, and defendants shall comply therewith.

4. The Court retains jurisdiction of this cause for the entry of such further orders as may be advisable.