**Virgie Lee VALLEY, et al**

v.

**RAPIDES PARISH SCHOOL BOARD**

Civil Action No. 10,946–A.

United States District Court,
W.D. Louisiana,
Alexandria Division.

March 11, 1997.

---

Franz Marshall, U.S. Dept. of Justice, Educational Opportunities Section, Washington, DC.

Louis Berry, Alexandria, LA.

Robert L. Hammonds, Baton Rouge, LA.

James C. Downs, Asst. Dist. Atty., Alexandria, LA.

Additional Counsel for intervention portion of suit:

Henry B. Bruser, III, Alexandria, LA.

Daniel E. Broussard, Jr., Alexandria, LA.

John G. McLure, Alexandria, LA.

## OPINION

NAUMAN S. SCOTT, District Judge.

Before the court is a Motion for Declaratory Judgment, filed on behalf of the Rapides Parish School Board (the "Board"). The Board prays for a declaratory judgment regarding the validity of Article 8, 513 of the Louisiana Constitution, as amended, and Act 973 of 1995, which provide for the creation of an independent school district for Wards 9, 10, and 11 of Rapides Parish ("the North Rapides Independent School District"). In an Order signed on October 24, 1996, we decreed that the statutory requirement of the Rapides Parish School Board to implement the provisions of Act 973 of 1995 be stayed until such time as we could rule on the merits of the Board's pleading. We also solicited position memoranda from the Attorney General of the State of Louisiana and all other interested parties. Having considered the evidence propounded as well as the authorities presented by counsel, for the reasons set forth below, we grant the Board's motion for a declaratory judgment.

This analysis is divided into two parts: the first part is an analysis of the issue of whether the court should enter a declaratory judg-

ment in this case, and the second part is an analysis of the validity of the above-mentioned Louisiana constitutional provision and statute. We turn to the first part of the analysis.

■ The scope of a federal district court's power to enter a declaratory judgment is defined in the Declaratory Judgment Act, 28 U.S.C. § 2201. Where appropriate, a federal court may either grant declarative relief as the sole remedy, or it may grant declarative relief in addition to other coercive remedies. *Nashville. C. & St.L. Ry. v. Wallace*, 288 U.S. 249, 259, 53 S.Ct. 345, 346, 77 L.Ed. 730 (1933). A federal court may issue a declaratory judgment only in "a case of actual controversy," and only where that case is within the court's subject matter jurisdiction.[1] 28 U.S.C.A. § 2201.

■ Where subject matter jurisdiction is proper, the court may issue a declaratory judgment only in "a case of actual controversy." 28 U.S.C.A. § 2201. One purpose for this rule, which is consistent with the constitutional limitations on the power of federal courts[2], is that it prevents declaratory judgments from being used to circumvent the general prohibition on federal courts rendering advisory opinions on hypothetical fact scenarios. *Rowan Companies, Inc. v. Griffin*, 876 F.2d 26, 27 (5th Cir.1989); *See* 10A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure* § 2757 (1983). To fulfill the "case of actual controversy" requirement, there must exist a real and substantial controversy between parties of adverse interests.[3] *Aetna Life Ins. Co. of Hartford. Conn. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937); *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). We conclude that the instant case is indeed the requisite "case of actual controversy." As with the motion of which Judge Politz wrote in *Rowan Companies, Inc.*, the issue before us "is not a hypothetical, conjectural, or conditional question, or one based on the possibility of a factual situation that may never develop. Rather, the controversy is real, definite, and concrete, and therefore justiciable, for all of the acts necessary for resolution of the merits of the claim ... occurred prior to the filing of (the) complaint." 876 F.2d at 28.

■ The Board is faced with a constitutional mandate to divide Rapides Parish into two school districts. Like the movant in *Rowan Companies, Inc.*, the Board moves for declaratory judgment as "a means of settling an actual controversy before it ripens into a violation of the civil or criminal law, or a breach of a contractual duty." *Id.* (citing *Scott–Burr Stores Corp. v. Wilcox*, 194 F.2d 989, 990 (5th Cir.1952)). Of course, the Board might have taken a more passive tack, and rather than file its motion for declaratory judgment it might have simply complied with the Louisiana constitutional mandate to divide the Rapides Parish school district into two halves. However, several months later, this court might well have held that the plan to ligate the Rapides Parish school district is invalid. Such delay in disposing of the issue would surely result in a significant wasted investment of time, resource, and administrative energy. Significantly, this loss would be borne not only by the Board itself, but by the taxpayers of Rapides Parish, and by the school children whose resources are already in short supply.

The Supreme Court has recognized that the declaratory judgment is an equitable remedy. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 142, 87 S.Ct. 1507, 1512, 18

---

1. This case falls squarely within the court's federal question subject matter jurisdiction, under 28 U.S.C. § 1331. *See Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 242, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952). *See also* 28 U.S.C. § 1343(a)(3).

2. U.S. Const. art. III, § 2, *see* Lea Brilmayer, *The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement*, 93 Harv. L.Rev. 297, 300 (1979).

3. The fact that it is the Board, rather than the Plaintiffs, that seeks this judicial declaration is not fatal to the "case of actual controversy" requirement. 876 F.2d at 28 (citing *Government Empl. Ins. Co. v. LeBleu*, 272 F.Supp. 421, 427 (E.D.La.1967), and explaining that the purpose of the declaratory judgment is "to afford one threatened with liability an early adjudication without waiting until his adversary should see fit to begin an action after the damage has accrued.") *see Seattle School Dist. No. 1 v. State of Wash.*, 633 F.2d 1338 (9th Cir.1980).

L.Ed.2d 681 (1967). The decision of whether to grant a declaratory judgment rests in the "sound discretion of the trial court exercised in the public interest." 10A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure* § 2759 (1983) (citation omitted) We hold that in balancing the equities, and under the rule of *Rowan Companies, Inc.*, we must grant the Board's motion for declaratory judgment, and dispose of this issue now, rather than after the damage has been realized. 876 F.2d at 28.

■ We now turn to the substantive issue before the court, and the second part of our analysis: whether the constitutionally-mandated plan to sever the North Rapides Independent School District is valid. We conclude that it is not.

On October 21, 1995, the electors in Louisiana approved an amendment to Article 8, § 13 of the Louisiana Constitution of 1974, authorizing the creation of a separate public school system to be operated in Wards 9, 10, and 11 of Rapides Parish.[4] Act 973 of the 1995 Regular Session of the Louisiana Legislature, which became operative with passage of the amendment to Article 8, § 13 of the Louisiana Constitution, imposed several statutory duties on the Rapides Parish School Board regarding creation of the North Rapides Independent School District. The issue before the court, and by which the outcome of this adjudication is driven, is whether the Fourteenth Amendment to the federal Constitution is offended by the creation of the North Rapides Independent School District.[5]

In *Brown v. Board of Education (Brown I)*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court held that school boards could no longer maintain separate school systems for blacks and whites, and that they must administer one school system for all students. Over the past forty years, a long series of Supreme Court cases has explained to us that federal district courts will oversee school systems' efforts to progress toward the goal of "unitary" school systems. *See Brown v. Board of Education (Brown II)*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), *Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Our charge, under this line of cases, is to prosecute the goal of the Rapides Parish school district attaining unitary status, and the Rapides Parish school district will not attain unitary status until the vestiges of state-imposed or *de jure* segregation in the district have been eliminated "root and branch." 391 U.S. at 437–438, 88 S.Ct. at 1694.

■ We adopted the Rapides Parish school desegregation plan that is now in effect back in 1980. *See Valley v. Rapides Parish School Bd.*, 499 F.Supp. 490 (W.D.La. 1980), *aff'd in part, rev'd in part* and remanded, 646 F.2d 925 (5th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982). Until the goal of unitariness is achieved in Rapides Parish, we must continue to implement our desegregation plan, and even modify it as necessary to continue to progress toward our goal. *See Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), *United States v. Lawrence County School Dist.*, 799 F.2d 1031, 1042 (5th Cir.1986).

■ Moving our analysis to the narrow issue at bar, the rule is that where a state attempts to splinter-off a new school district from a school district that is in the remedial-

---

4. Generally, this is the geographic slice of Rapides Parish north of the Red River. Wards 9, 10, and 11 are predominantly white, and less urban than the area south of the Red River, which includes the city of Alexandria.

5. *See* U.S. Const. art. VI, § 2 (The Supremacy Clause is, of course, one of the most irreducible ingredients in the recipe for our federal system, and reads "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; .. shall be the supreme Law of the

Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see North Carolina Bd. of Ed. v. Swann*, 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971) ("However, if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; *state policy must give way when it operates to hinder vindication of federal constitutional guarantees.*")

mode under a desegregation plan, the splintering-off must be "judged according to whether it hinders or furthers the process of school desegregation." *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 489, 92 S.Ct. 2214, 2217, 33 L.Ed.2d 75 (1972), (citing *Wright v. Council of City of Emporia,* 407 U.S. 451, 460, 92 S.Ct. 2196, 2202, 33 L.Ed.2d 51 (1972)); *see Stout v. Jefferson Cty. Bd. of Ed.,* 448 F.2d 403 (5th Cir.1971).

■ The rule from this *Scotland Neck* case is significant in our analysis. Because we are in the remedial-mode of implementing our desegregation plan, and have not yet attained our goal of unitary status in Rapides Parish, the test is simply whether Act 973 and Art. 8 § 13 of the Louisiana Constitution of 1974 interfere with the process of school desegregation. We need not make a factual inquiry into whether there was a *"de jure"* intent to discriminate on the basis of race when Act 973 and Art. 8 § 13 of the Louisiana Constitution of 1974 were created.[6] We conclude that they do indeed interfere with the process of school desegregation, and are therefore unconstitutional, under the rule from *Scotland Neck.* 407 U.S. at 489, 92 S.Ct. at 2217.

In its Memorandum in Response to Declaratory Judgment, the Louisiana Attorney General argues that this court cannot judge the validity of Act 973 under the *Scotland Neck* standard until "the new school board is constituted and the new districting plan is implemented." We disagree.

The Board propounded ample evidence for the court to determine whether or not the desegregation plan "hinders or furthers the process of school desegregation." The Louisiana Attorney General's proposal, that we delay ruling on the validity of the new school district until after the Board spends the mon-

ey, time, and administrative energy on severing the new school district, is absurd.

We turn to our analysis of how Act 973 and Art. 8 § 13 of the Louisiana Constitution of 1974 hinder the process of school desegregation. As of March 25, 1996, over 8,000 students resided in Wards 9, 10, and 11. Movant's Exhibit "A". Of these students in Wards 9, 10 and 11, only thirteen percent are black. In other words, severing the north Rapides district would remove a large pool of whites from the Rapides Parish school system.

Over 1,500 students reside in, but attend schools outside of, Wards 9, 10, and 11, and eighty-four percent of these students are non-black. Movant's Exhibit "C". Removal of this pool of students from the Rapides Parish school district would have the effect of re-segregating the races, because of the disproportionately high percentage of whites north of the Red River.

Over 1,600 students from south of the Red River attend schools in Wards 9, 10, and 11, and seventy-seven percent of these students are black. Movant's Exhibit "D". These seventy-seven percent being bussed north of the Red River make a significant contribution to the overall desegregation plan, and severing Wards 9, 10, and 11 would effect a re-segregation plan if allowed to stand.

The Board also propounds a report prepared by Mr. Earl J. Cooper, Supervisor of Transportation, regarding the average transportation times for students going to Wards 9, 10, and 11 and for students residing in Wards 9, 10, and 11 but attending schools outside these Wards. Movant's Exhibit H. The upshot of this evidence is that severing Wards 9, 10, and 11 may place a greater burden on some students south of the Red River who may need to be bussed further than before to effect a successful desegregation plan.

In other words, the Attorney General of Louisiana's reliance on language in the *Swann* case for the proposition that "disparity in racial balance alone is not determinative of the validity of the Act in question" is misplaced. Because we are in the mode of remedying prior *de jure* acts in Rapides Parish, this "disparity in racial balance" is indeed sufficient to invalidate the Act in question.

---

**6.** *See Dayton Bd. of Ed. v. Brinkman,* 443 U.S. 526, 527, 99 S.Ct. 2971, 2974, 61 L.Ed.2d 720 (1979) (Although *Dayton* is a Northern desegregation case, it illustrates this distinction: "The measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is *the effectiveness,* not the purpose of the actions in decreasing or increasing the segregation caused by the dual system.")

As the Board correctly points out in its Memorandum in Support of Motion for Declaratory Judgment, severing Wards 9, 10, and 11 from the Rapides Parish School District would change the racial balance in the district south of the Red River from sixty percent white and forty percent black to forty-seven percent white and fifty-three percent black. In other words, there would be a profound rise in the percentage of whites in school north of the Red River (an area in which a predominant white population resides), and a decrease in the percentage of whites in school south of the Red River (an area with a greater percentage of blacks than north of the river).[7]

 Where there has been a judicial finding that intentional *de jure* segregation once existed, the lack of sinister intent where segregative effects occur does not save the act in question. 391 U.S. at 438, 88 S.Ct. at 1694. In the instant case, we have a desegregation plan in effect, the Rapides Parish school district has not yet attained unitary status, and the district is therefore under an affirmative duty, not just to refrain from further intentionally segregative acts, but to eradicate the vestiges of prior *de jure* segregation. *Id.* Under the rule from *Scotland Neck,* where the State of Louisiana is attempting to splinter-off this new school district from one that is under an ongoing desegregation plan, the splintering-off must be "judged according to whether it hinders or furthers the process of school desegregation." 407 U.S. at 489, 92 S.Ct. at 2217. Based on the evidence propounded and the authorities cited by the parties, we grant the Board's motion for declaratory judgment, and conclude that Act 973 of the 1995 Regular Session of the Louisiana Legislature, which became operative with passage of the amendment to Article 8, § 13 of the Louisiana Constitution, is unconstitutional, because it hinders the process of school desegregation, and therefore violates the Equal Protection Clause of the Fourteenth Amendment.

***JUDGMENT***

For written reasons this date assigned, it is

ORDERED, ADJUDGED AND DECREED that the defendant School Board's Motion for Declaratory Judgment is hereby **GRANTED;** it is further

ORDERED, ADJUDGED AND DECREED that Act 973 of the 1995 Regular Session of the Louisiana Legislature, which became operative with the passage of the amendment to Article 8, § 13 of the Louisiana Constitution is unconstitutional for reasons set forth in the Opinion above referred to.

---

7. *See* 407 U.S. at 489–490, 92 S.Ct. at 2217–2218 (In invalidating a similar attempt by a state to carve out a new school district, the Supreme Court wrote "The traditional racial identities of the schools in the area would be maintained; the formerly all-white Scotland Neck school would retain a white majority, while the formerly all-Negro Brawley school, a high school located just outside Scotland Neck, would be 91% Negro ... " And we have said today in *Wright v. Council of City of Emporia* ... that "desegregation is not achieved by splitting a single school system operating 'white schools' and 'Negro schools' into two new systems, each operating unitary schools within its borders, where one of the two new systems, is, in fact, 'white' and the other is, in fact, 'Negro.' ").