**REVISED, July 16, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-30323

_____

VIRGIE LEE VALLEY, et al.,

                                    Plaintiffs,

UNITED STATES OF AMERICA,

                                    Intervenor-
                                    Plaintiff-Appellee,

              VERSUS

RAPIDES PARISH SCHOOL BOARD,

                                    Defendant-Appellee,

RICHARD P. IEYOUB,
Attorney General of the State of Louisiana,

                                    Appellant.

_____

Appeal from the United States District Court
for the Western District of Louisiana
_____

June 26, 1998

Before WISDOM, SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


The Attorney General of Louisiana appeals a judgment striking

a state constitutional amendment and invalidating implementing legislation designed to divide the Rapides Parish School District into two districts.  Finding this case not ripe for review, we vacate and remand.

I.

A.

The Rapides Parish School Board ("RPSB") operated a constitutionally impermissible dual school system§§one for whites and one for non-whites§§at the time of *Brown v. Board of Educ.*, 347 U.S. 483 (1954) (*Brown I*).  In light of *Brown* and its progeny§§which directed that schools be desegregated "with all deliberate speed," *Brown v. Board of Educ.*, 349 U.S. 294, 301 (1955) (*Brown II*)§§black children in 1965 filed suit against the RPSB, seeking desegregation.

In the intervening thirty-three years, the district court has imposed successive plans to achieve integration.  None apparently has achieved unitary status or has brought the district court to the point of relinquishing its remedial powers over the RPSB.[1]

At first, the district court settled upon a "free choice" plan that removed the barriers for blacks to go to white schools and *vice versa*, but stopped short of forced integration.  When the

_____

[1] The district court recently extended its order through the 2005-06 school year.

2

Supreme Court struck down a similar program in *Green v. County Sch. Bd.*, 391 U.S. 430 (1968), this court directed the district court to be more aggressive in achieving integration, using the *Green* factors. That was in 1969. *See generally Valley v. Rapides Parish Sch. Bd.* ("*Valley I*"), 646 F.2d 925, 929-30 (describing the history of the litigation), *modified*, 653 F.2d 941 (5th Cir. Unit A May 1981).

Since that time, the district court has given careful attention to the racial ratios of the students, faculty, and administrators in each school. The program continues to this day and involves extensive busing and other means to achieve racial parity. The district court remains active in redrawing the lines of attendance at schoolsSSat regular intervalsSSin order to maintain racial balance and in managing other aspects of running the RPSB.

At issue in this case are Wards 9, 10, and 11 of Rapides Parish (the "northern wards"), all north of the Red River. These wards are primarily white, while the remaining wardsSSlocated in the city of Alexandria, south of the riverSSare more racially mixed. The northern wards areSSand have beenSSpart of the RPSB.

Throughout the litigation, the district court has made a continuing effort to maintain racial balance in the city schools of Alexandria. Accordingly, the court has ordered the RPSB to bus white students from these suburbs to the city and to do the opposite with non-white students from the city. The district court

3

has been hindered in its quest for racial balance, however, by increases in white flight and in black enrollment.

In 1995, the state legislature approved a ballot measure to change the state constitution to form a separate school district in the northern wards and to allow it to elect its own school board. The measure was approved by state voters and proclaimed part of the state constitution by the governor in November 1995. *See* LA. CONST. art. VIII, § 13(D), and advisory notes.

Contemporaneously, the legislature passed enabling legislationSSAct 973SSto provide, among other things, for the drawing of election districts for the members of the new district's board. *See* LA. REV. STAT. ANN. § 17:62. Assuming the Justice Department's approval of the voting districts under the Voting Rights Act, the election for the initial board members is to take place with the congressional elections in November 1998. *See id.* § 17:62(C).

B.

The RPSB filed the instant declaratory judgment actionSSas part of its ongoing school desegregation litigationSSin October 1996, praying for a declaration that Act 973 is unconstitutional as applied to the RPSB because it interferes with the RPSB's ability to conform to the desegregation order. *See Valley v. Rapides Parish Sch. Bd.*, 960 F. Supp. 96, 97 (W.D. La. 1997). At the

4

district court's request, the RPSB served notice on the state attorney general, who is the officer statutorily obliged to defend the state's laws.

The attorney general filed a response opposing the declaratory judgment but did not have the opportunity to introduce evidence in support of the law.[2] Instead, he argued that a declaratory judgment was improper because the claim is not ripe for review. Even if it were ripe, he reasoned, the law does not unconstitutionally infringe on the district court's remedial authority.

The district court found that there was a ripe case or controversy needed to sustain a declaratory judgment action, because the school district faced substantial uncertainty and expense if subjected to the possibility of adhering to two conflicting obligationsSSone imposed by the state constitution and the other by the federal court. *See id.* at 98. Reaching the merits, the court relied on the fact that without the northern wards, there would be fewer white children in the remaining school district. The resulting RPSB would become slightly more black than white, while the new district would be overwhelmingly white.[3] The court held that because of this change in racial balance, Act 973 impermissibly infringes on its remedial powers and thus offends the

_____

[2] The district court did not hold an evidentiary hearing before it entered its order.

[3] The students residing in the remaining RPSB would be 60% black and 40% white, while those residing in the new district would be 87% white and 13% black.

5

federal Constitution.  *See id.* at 100-01.

The state appeals this adverse judgment.  The RPSB, and the United States as plaintiff-intervenor, argue for affirmance.[4]

II.

A.

Ripeness concerns subject matter jurisdiction, so we consider it *de novo*.[5]  Subject-matter jurisdiction can be raised at any time, even *sua sponte*.  *See, e.g.*, *Marathon Oil Co. v. Ruhrg*as, 1998 U.S. App. LEXIS 13358, at *12 (5th Cir. June 22, 1998) (en banc).

B.

With any declaratory judgment action, there is a concern that the legal issues will not be sufficiently developed for the court to make a decision on the merits.  Instead, the court may face a set of facts so contingent on other events that a decision would constitute no more than an advisory opinion on an abstract legal

---

[4] Not participating in the appeal are the original minority plaintiffsSSthe parties ostensibly sued by the school district in its declaratory judgment action.  The real adverse parties appear to be the proposed new school district and the state.

[5] *See Powder River Basin Resource Council v. Babbitt*, 54 F.3d 1477, 1483 (10th Cir. 1995); *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 n.8 (3d Cir. 1988).  A decision to stay a declaratory judgment proceeding when there is a parallel state court proceeding is reviewed for abuse of discretion.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-83 (1995).  We decline to adopt the appellants' suggestion that *Wilton* addresses the district court's finding of Article III subject-matter jurisdiction under the ripeness doctrine.

dispute. Accordingly, before addressing the merits of the case, courts must be vigilant, in declaratory judgment suits, to make certain the action is ripe for review.

### 1.

"Ripeness is a function of an issue's fitness for judicial resolution as well as the hardship imposed on the parties by delaying court consideration."[6] Thus, in considering a declaratory judgment action's ripeness for review, we address both a constitutional requirement and prudential concerns. The Supreme Court most recently has reminded us of the importance of these considerations. *See Texas v. United States*, 118 S. Ct. 1256, 1259-60 (1998); *accord National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("*NTEU*").

### a.

A federal court must find that Article III standing requirements are met. These include (1) "injury in factSSan invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) causation, meaning that the injury is "fairly traceable to the challenged action of the defendant"; and (3)

---

[6] *Jobs, Training & Servs., Inc. v. East Tex. Council of Gov'ts*, 50 F.3d 1318, 1325 (5th Cir. 1995); *see, e.g.*, *Abbott Lab. v. Gardner*, 387 U.S. 136, 149 (1967).

redressability, meaning that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted); *see NTEU*, 101 F.3d at 1427. The standing component that deals directly with ripeness is the requirement of "imminence." In a declaratory action, the threatened injury must be "sufficiently 'imminent' to establish standing." *NTEU*, 101 F.3d at 1428.

b.

Once the constitutional showing has been made, a court must satisfy prudential concerns by balancing the need to expend its resources on a case it may never need to decide against the expense and hardship to the parties of having a delayed adjudication. The court must make sure that a sufficient factual basis, and necessity on the part of the parties, exist to justify the expenditure of judicial resources. "Prudentially, the ripeness doctrine exists to prevent the courts from wasting our resources by prematurely entangling ourselves in abstract disagreements . . . ." *Id.* at 1431.[7] These prudential concerns ensure that changing hypothetical circumstances or lack of party interest does not make resolution of

---

[7] *See also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 118 S. Ct. 1665, 1670 (1998) ("[T]he ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . .'") (quoting *Abbott Lab.*, 387 U.S. at 148-49).

the legal issues unnecessary. "Article III courts should not make decisions unless they have to." *Id.*

2.

a.

This case is not ripe for adjudication, because it fails to satisfy the Article III "case or controversy" requirement. Under the Article III analysis, there is no *imminent* threat of harm to the RPSB or to the desegregation decrees. As the district court found, there is a *potential* threat of harm. RPSB *could* be subjected to conflicting obligations of the federal court and the state constitution. The harm's *probability of occurrence*, however, is sufficiently remoteSSgiven the myriad of contingencies necessary for it to developSSthat it fails to constitute the *immediate* harm necessary for Article III justiciability.

In order for the RPSB to face an imminent risk of violation of the desegregation order, too many contingencies would have to occur. There would have to be a new district in the northern wards with a proposed plan that would unconstitutionally interfere with the court's remedial authority. For that to occur, there would have to be a proposed plan about how the new district would operate in relation to the RPSB. For that to occur, there would have to be an election of a new board. And for that to occur, there would have to be Justice Department preclearance of the new voting

9

districts. Because any one of these numerous links may not come to be, the string of contingencies is too tenuous to support ripeness.[8]

b.

Even if these contingencies were to constitute an imminent injury, prudential concerns strongly dictate against the district court's conclusion that this case is ripe for adjudication, for there is a substantial possibility that the actions of the new board will not violate the court's orders. For example, the new board could adopt an inter-district busing and teacher reassignment plan with the RPSB to comply with the remedial order. Such a plan likely would moot the controversy.

Essentially, the threat of noncompliance with the court's orders will not occur unless the new board seeks to become operational under Act 973 and then decides to take actions that, under the existing caselaw,[9] would unconstitutionally interfere

---

[8] See *Texas v. United States*, 118 S. Ct. at 1259 ("A claim is not ripe for adjudication if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"") (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)). The existence of a law is not, by itself, necessarily sufficient to establish imminent injury. *See, e.g.*, *United Pub. Workers v. Mitchell*, 330 U.S. 75, 90 (1947) ("A hypothetical threat is not enough."); *id.* at 91 ("No threat of interference by the Commission with rights of these appellants appears beyond that implied in the existence of the law and the regulations.") (citation omitted).

[9] The Supreme Court addressed the constitutionality of "splinter school districts" in *United States v. Scotland Neck City Bd. of Educ.*, 407 U.S. 484, 490 (1972), and *Wright v. Council of the City of Emporia*, 407 U.S. 451, 464-66 (1972), and this circuit thoroughly considered the issues in *Ross v. Houston*

(continued...)

10

with the orders. Although the RPSB need not wait until an actual disruption occurs in order to seek declaratory and injunctive relief, it should wait at least until there is a concrete threat. Here, that would mean that it must defer at least until the new board is in place and develops a plan for how it proposes to run the new district.

Also important is the need to conserve judicial resources. As we have said, this dispute may end up being entirely academic, as no one can know what a not-yet-elected board will do. The RPSB and the United States have imputed to this yet-to-exist body its worst-case parade of horribles. Both have assumed that the new district will do everything it can to thwart the district court's remediation of the past *de jure* segregated school system. From the record, there is no basis for that fear. The ripeness balance therefore weighs in favor of waiting to address this controversy.

Our ripeness holding is underscored by our holding in *Ross v. Houston Indep. Sch. Dist.*, 577 F.2d 937, 944-45 (5th Cir. 1977) (per curiam). There, we made plain the proof needed by the proponent of the splinter district:

> WISD [the new school district] must, at the outset, establish what its operations will be. It cannot meet this requirement by simply reasserting the admission previously filed; rather, WISD must express its precise policy positions on each significant facet of school district operation. For example, it should state how it

---

[9](...continued)
*Indep. Sch. Dist.*, 559 F.2d 937, 943-44 (5th Cir. 1977) (per curiam).

11

plans to work with HISD regarding interdistrict pupil assignments, including transportation; curriculum composition and control; teacher employment, discharge, assignment and transfer; financing and taxation; school building construction, utilization and closing procedures; special district-wide efforts such as the magnet school program; administration; and any other areas of public school operations or support which the district court may specify as pertinent to the accomplishment of its underlying desegregation order. Even after this definitive statement has been made, the burden remains on WISD to establish that its implementation and operation will meet the tests outlined for permitting newly created districts to come into being for parts of districts already under an ongoing court desegregation order.

*Id.* (citation omitted). Given the facts of the instant case, as now developed, the state——and more importantly, the new board——should have an opportunity to offer such proof.

Finally, there are fairness concerns. The state——which has the burden of proving its own law's constitutionality[10]——has had no reasonable opportunity to meet its burden, as most of the information it would have to present for this purpose simply does not exist.

The real adverse party in interest is the yet-to-be-formed school board. Its actions——or inactions——are fundamental to a determination whether the RPSB has an injury of which to complain. We should not allow the forfeiture of its possible interests

---

[10] In most civil litigation, the burden of proof is on the party seeking to invoke the court's remedial authority. Therefore, the failure to introduce evidence necessary to meet the legal standard would be grounds to dismiss for failure to state a claim. School desegregation cases, however, are an exception. The party seeking to escape from the court's remedial authority bears the burden of proving that its actions are not intended to re-establish *de jure* segregation. *See Freeman v. Pitts*, 503 U.S. 467, 494 (1992).

without the presentation of a defense.

## III.

If and when this case becomes ripe for reviewSSand if and when the parties thereafter decide to reassert a request for reliefSSthe district court should apply the legal test outlined in *Wright v. Council of the City of Emporia*, 407 U.S. 451, 464-66 (1972), and elucidated in *Ross*.  Necessarily, the district court would have to hold an evidentiary hearing or otherwise provide an avenue for the parties to introduce evidence.[11]

The judgment is VACATED, and this matter is REMANDED for further proceedings in accordance with this opinion.

ENDRECORD

---

[11] From *Ross*, the district court should realize that consideration of all the factors of the *Wright* test is necessary to inform the use of its remedial discretion when deciding whether to invalidate the instant state constitutional amendment and its implementing legislation.  *See Ross*, 559 F.2d at 944 ("The right of WISD to implement and operate a new and separate school district partly within the geographic confines of HISD has never been tested by the criteria established in these precedents.  We remand the case so that the district court can make the required assay.").

WISDOM, Senior Circuit Judge, dissenting:

I respectfully dissent.

This case is so bursting with over-ripeness that it emits an unpleasant odor.

Should this case be sent back to the district court, the district judge will find again the controlling fact already well known to the district judge, a life-long Alexandrian and a federal district judge since his appointment in October 1970. The controlling fact, well known to Louisiana and to this Court, is that the area covered by the ninth, tenth, and eleventh wards of the eleven wards in Rapides Parish is clearly defined as the predominantly white section of Alexandria. It is admittedly eighty-seven per cent white, and may be more. The proposed majority opinion is, therefore, a blatant attempt to establish a special public school district for whites in a limited area known as the white section of Alexandria.

The notion expressed in the first sentence of the proposed majority opinion that the enabling legislation was "designed to divide the Rapides Parish School District into two districts", is indeed an admission of the fact that the plan is an attempt to establish <u>de jure</u> segregation in Alexandria public schools -- at least for the time it will take to overcome stalling and for the case to be decided en banc or for it to reach the United States Supreme Court.

14

The enabling legislation is directly contrary to <u>Brown</u>,[12] <u>Brown II</u>,[13] and to <u>Bolling v. Sharpe</u>,[14] and to the spirit of numerous decisions of this Court.

The time to stop it is now.[15]

It is incredible that half a century after <u>Brown</u>, one should have to ask for an en banc judgment to prevent the establishment of a school for whites in a public school system. That is necessary in this case where ripeness "is a cape for unauthorized appellate

---

[12]    347 U.S. 483 (1954).

[13]    349 U.S. 294 (1955).

[14]    347 U.S. 497 (1954).

[15]    The majority is willing to accept <u>Wright v. City of Emporia</u>, 407 U.S. 451 (1972). Fine. The true "test" from <u>Wright</u> and the similar case of <u>United States v. Scotland Neck City B. Of Educ.</u>,407 U.S. 484, 490 (1972), is "whether [the splinter district plan] hinders or furthers the process of desegregation. If the proposal would impede the dismantling of a dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out". <u>Ross v. Houston Ind. School Dist.</u>, 559 F.2d 937, 943 (5th Cir. 1977).

<u>Wright</u>, like the Rapides case, involved a school district under court order to dismantle a dual educational system. 407 U.S. at 455-9. The <u>Wright</u> court's chief concern with the creation of a splinter school district was that the division would impede the efforts to dismantle the dual system. The court held that "a new school district may not be created where its effect would be to impede the process of dismantling the dual system." <u>Id</u>. at 470. This point is important. The obvious effect of the plan to divide the Rapides Parish School District is the creation of a predominately white school district north of the Red River and a predominately black school district south of the Red River. There is no justification for considering the current plan two or three years down the road, thanks to the appellate process. The court must now consider the racial makeup of the new district.

15

rule making".[16]  Here, however, the cape has rubbed hard against the rock of controlling fact.  The cape is in tatters.

The majority's opinion, not the first submitted on the immediate issue, impels an en banc proceeding.

---

[16] <u>Marathon Oil Corp. V. Ruhrgas</u>, No. 96-20361 (5th Cir. 1998) (en banc) (Higginbotham, J., dissenting).