**Will GRAY, et al., Plaintiffs**

v.

**LOWNDES COUNTY SCHOOL DISTRICT, et al., Defendants.**

**Walter Shinn, et al., Plaintiffs**

v.

**Charles Johnson, et al., Defendants.**

**United States of America, Plaintiff**

v.

**Columbus Municipal Separate School District, et al., Defendants.**

Nos. 1:02CV256–M–A, 1:03CV623–M–D, EC70–55.

United States District Court, N.D. Mississippi, Eastern Division.

Oct. 24, 2012.

Michael S. Adelman, Adelman & Steen, LLP, Hattiesburg, MS, for Will Gray, et al.

Jeffrey C. Smith, Sims & Sims, Columbus, MS, for Lowndes County School District, et al.

Alvin O. Chambliss, Jr., Attorney at Law, Oxford, MS, for Walter Shinn, et al.

James A. Keith, Adams and Reese LLP, Ridgeland, MS, for Charles Johnson, et al.

### ORDER

MICHAEL P. MILLS, Chief Judge.

This cause comes before the court on the motion of the Lowndes County School District ("The District") for declaration of unitary status in the above-entitled school desegregation case. The United States does not oppose the motion, although certain private plaintiffs have, in fact, responded in opposition thereto. Having considered the memoranda and submissions of the parties, and having conducted a Fairness Hearing on July 31, 2012, the court is now prepared to rule.

### I. History of the Case

The United States initiated this action against the District and many other Mississippi school districts more than forty years ago, alleging the unlawful operation of a racially dual system of public education in violation of the Fourteenth Amendment of the United States Constitution and Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6. In an order dated September 5, 1970 ("1970 Order"), this court permanently enjoined the District from discriminating on the basis of race or color in its operations. The 1970 Order contained provisions governing, among other things, student assignment, faculty and staff, transportation, school construction and site selection, extracurricular activities, and a bi-racial advisory committee.

Since the 1970 Order, the court entered other consent orders in this case. These orders included a February 15, 1989 Consent Decree ("1989 Consent Order"), which provided for, among other things, construction of a new West Lowndes Elementary School to replace three existing schools and educational enhancements to programs offered at the West Lowndes schools. This court also entered a June 23, 2001 Consent Order ("2001 Consent Order"), which provided for renovations and construction of, *inter alia,* a new football facility with practice field and a new baseball facility at West Lowndes High School and which required replacement of the above-ground sewage lagoon at the West Lowndes Middle School with an underground system.

In 2002 and 2003, certain private plaintiffs brought separate lawsuits, *Gray et al. v. Lowndes County Schools* and *Shinn et al. v. Charles Johnson,* seeking compliance by the District with its desegregation obligations. On May 26, 2004, this Court consolidated these two lawsuits filed by private plaintiffs ("Private Plaintiffs") with the original desegregation case brought by the United States.

After discovery and good faith negotiations, the United States, the Private Plaintiffs, and the District agreed to a Consent Order, which this Court approved on January 3, 2006 (the "2006 Consent Order"). In the 2006 Consent Order, the court found that the District was partially unitary with respect to (a) student assignment, (b) faculty and staff assignment, and (c) transportation. The 2006 Consent Order provided that when the District complied with the 2006 Consent Order, it could file its motion for unitary status and dismissal of this lawsuit with prejudice.

On August 21, 2008, the District moved for unitary status, asserting compliance with the 2006 Consent Order. On October 1, 2008, the United States opposed the District's motion and moved to enforce the 2006 Order on four grounds: (a) the West Lowndes High School baseball field was not comparable to the fields of the other two high schools because it did not drain as well and had low spots, resulting in rescheduled or cancelled home games, (b) the West Lowndes High School entryway did not function properly, (c) there was an absence of policies and procedures at West Lowndes Middle and High Schools related to advanced instruction, and (d) there were continued community complaints of racial harassment and discrimination at the District's majority white schools. The parties moved to withdraw their respective motions and to engage in good faith settlement negotiations to resolve the District's remaining desegregation obligations. On October 16, 2008, this court approved withdrawal of the parties' respective motions.

The result of the negotiations between the United States, the Private Plaintiffs, and the District is set out in the Consent Order entered on February 3, 2009 ("2009 Consent Order"). The 2009 Consent Order required the District to address four remaining specific issues before obtaining unitary status: (1) improvements to the baseball field at West Lowndes High School; (2) improvement of the entryway at West Lowndes High School; (3) implementation of an advanced placement program in the District; and (4) implementation of a policy against racial harassment and discrimination in the District. *Id.* The District has filed formal reports related to these issues, as required by the 2009 Consent Order.

## II. District's Motion for Unitary Status and Fairness Hearing

On May 15, 2012, the District filed the instant motion seeking for this court to declare that it had achieved unitary status,

to dissolve all prior injunctive orders issued in this case, and to dismiss the case with prejudice. The United States filed a response stating that it does not object to the District's obtaining unitary status or to the dismissal of this case. The Private Plaintiffs filed a response objecting to the District's request for unitary status on limited grounds.

The Private Plaintiffs, the United States, and the District (collectively, the "Parties") agree that the Fifth Circuit Court of Appeals remanded the case to the jurisdiction of this Court. Although the style of the case names the Columbus Municipal Separate School District ("Columbus") as a defendant, Columbus and the District are separate legal entities operating separate school systems subject to different desegregation plans. Therefore, the District's motion for unitary status pertains only to the Lowndes County School District.

By order of June 7, 2012, this court set a Fairness Hearing for July 31, 2012, to consider the District's motion for unitary status. This court ordered the District to publish notice of the hearing and invite comments in two newspapers, one in Lowndes County where the District is located and the other with a predominantly African–American circulation. All parties agreed to the content and form of the public notice. Proof of publications were filed with the court.

On July 31, 2012 this court conducted the Fairness Hearing. The court found the proof in opposition to the declaration of unitary status at the hearing to be minimal. Notably, while twenty-five individuals wrote letters opposing the District's motion for various reasons or only stating a general objection, no private citizens actually appeared to voice their concerns at the hearing. Testifying in support of the District's motion was Mike

Halford, who served as Superintendent of the District from January 2004 through December 2011. The Private Plaintiffs subpoenaed one witness, Dr. Peggy Rogers, Assistant Superintendent for the District. The United States presented no witnesses and no documentary evidence.

### III. Legal Standard for Unitary Status

The ultimate inquiry in determining whether the District is unitary is whether (1) it has demonstrated "good-faith compliance" with its desegregation orders "for a reasonable period of time," *Freeman v. Pitts,* 503 U.S. 467, 498, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), and (2) has eliminated "the vestiges of de jure segregation ... as far as practicable." *Board of Education of Oklahoma Public Schools v. Dowell,* 498 U.S. 237, 250, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). In determining whether the District has eliminated vestiges of de jure desegregation as far as practicable, the Supreme Court has identified six areas of school operations, commonly referred to as the *Green* factors: student assignment, faculty, staff, transportation, facilities, and extra-curricular activities. *See Bd. of Educ. of Okla. City Pub. Sch. v. Dowell,* 498 U.S. 237, 250, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (discussing *Green v. County Sch. Bd. of New Kent County,* 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)).

By the 2006 Consent Order, this court, with the agreement of the United States and the Private Plaintiffs, has already declared the District partially unitary with respect to four of the *Green* factors: student assignment, faculty, staff, and transportation. The only remaining Green factors for full unitary status are facilities and extracurricular activities. In addition, the 2009 Consent Order required the District to implement a policy against racial

harassment and an advanced placement program and to make periodic reports to the Court and to the United States and Private Plaintiffs. This court will address these issues in turn.

## IV. Facilities

■ The 2009 Consent Order implicitly confirmed that the facilities in the District were equitable except for the baseball field and the entry way at West Lowndes High School. Neither the United States nor Private Plaintiffs raised any objection to facilities generally across the District.

### A. WLHS Baseball Field

The 2009 Consent Order required the District to engage a consultant to resolve drainage issues on the West Lowndes High baseball field so that the field would be comparable to the baseball facilities at the other two high schools in the District and to train the baseball coach in field maintenance and management. At the fairness hearing, Private Plaintiffs and the United States stated to the Court that they had no objection with respect to District's compliance with the 2009 Consent Order regarding the WLHS baseball field. The District's baseball field consultant concluded that the West Lowndes High School baseball field is comparable to or in better condition than the fields at Caledonia High School and New Hope High School. Also, Halford testified that the District worked with the consultant, as well as professional architects, to improve the field. The court finds that the proof on this issue supports the granting of the District's motion for declaration of unitary status.

### B. WHLS Entryway

The 2009 Consent Order required the District to "repair the new entryway [at West Lowndes High School] so that rain water does not leak through the canopy or gutters at any part of the covered entryway" and to document the repairs for the opposing parties. Halford testified that the entryway has been repaired, thereby resolving the leaks. The Private Plaintiffs and the United States stated to the Court that they had no objection under the 2009 Consent Decree regarding the repairs to the WLHS entryway.

Although not raised in their response to the District's motion for unitary status, the Private Plaintiffs questioned for the first time at the fairness hearing whether the District had provided requisite parking spaces at WLHS per the 2006 Consent Order. Halford testified that more than seventy parking spaces were added to the WLHS parking lot, but he was unsure of the exact number. He testified that, since these spaces were added, he has never observed any parking problems since these spaces were added other than on graduation day, when the volume of guests at all the District's high schools typically overwhelms available parking. Subsequent to the hearing, in order to address this concern, the District provided to counsel for the Private Plaintiffs an affidavit of Greg Wheat, Maintenance Supervisor for the District, that WLHS has a total of 218 marked parking spaces and 7 handicapped spaces at the facility, more than was required by the 2006 Consent Order. The court finds that the proof on this issue supports the granting of the District's motion for declaration of unitary status.

## V. Extracurricular Activities

■ The court finds that all students, regardless of race, are provided the opportunity to participate, and do participate, in the District's extracurricular activities. Photographs from the most recent school yearbooks show both black and white students participating together in the schools'

clubs, athletic teams, academic teams, and other extracurricular activities. Halford testified that at Caledonia High School, where the majority of students are white, the student body elected two black students as Mr. and Miss Caledonia High School in 2010. He also testified that the Caledonia student body elected both a black homecoming queen and a black prom king. The yearbook photos and Halford's testimony establish that black students routinely participate in extracurricular activities at Caledonia Middle School, New Hope High School, and New Hope Middle School, including athletics, academic teams, and student superlative honors. The court finds that the proof on this issue supports the granting of the District's motion for declaration of unitary status.

## VI. Advanced Placement Program

■ The 2009 Consent Order requires the District to implement an advanced placement ("AP") program pursuant to a policy agreed upon by all the parties. The Order specifically required the District to provide professional development for the staff involved in the program and to establish mechanisms for identifying and encouraging students qualified for advanced courses. The District was required to communicate with students and parents regarding the availability of the program and to encourage increased participation for those students who qualify.

Halford testified that the District implemented the program under the direction of Curriculum Coordinator Superintendent Edna McGill. He further testified that as a result of the District's efforts, the number of students at West Lowndes who were involved in AP courses increased from 5 students to 82 students over a four year period during the program's implementation. He testified that he has no reason to believe the District will discon-

tinue the AP program if it is declared unitary.

The United States represents to the Court that it has no objection regarding the District's implementation of the AP program. For their part, the Private Plaintiffs note that Assistant Superintendent Peggy Rogers testified that the number of students at West Lowndes passing their AP examinations has been "very low," and they accordingly contend that the District has failed to establish that it has fully implemented effective AP classes at West Lowndes High School. While the AP examination pass rate at West Lowndes is concerning, the court finds that, on balance, the proof on this issue supports the granting of the District's motion for declaration of unitary status.

## VII. Miscellaneous Issues

■ In addition to the specific items listed in the 2009 Consent Order and the *Green* factors, counsel for Private Plaintiffs questioned Halford regarding the time for school board meetings. Pursuant to Board policy, the regular time for meetings is 11:00 a.m. on the second Friday of each month, with any special called meetings held at 5:00 p.m. or 5:30. Board member Gray complained about the meeting time, and she has been able to attend the meetings. The court concludes that, while it is certainly arguable that the District should choose a more convenient time to hold its school board meeting, this issue does not constitute a basis for denying unitary status in this case.

## VIII. Non-discrimination Policy

■ The 2009 Consent Order requires the District to develop and implement a formal non-discrimination policy agreed upon by all the parties. The Order also required the District to train all of its employees regarding the policy and to en-

gage a consultant to assist in training. Neither Private Plaintiffs nor the United States contend that the District did not comply with its duties in this regard.

Halford testified that the policy requires the District to follow specific procedures in the event of a complaint of racial harassment or racial discrimination. Each complaint is to be investigated by a designated representative at each school and then reported on to Assistant Superintendent Peggy Rogers, a black female, designated as the District Compliance Officer ("DCO") for the policy. Subpoenaed to testify, Dr. Rogers confirmed that she generally oversees the implementation of the non-discrimination policy and ensures that complaint forms are completely filled out and investigated. Halford explained that the complaint forms are available to students and parents at each school and on the District's website. Copies of the investigation reports and discipline decisions are included in the District's reports to the Court, the United States, and the Private Plaintiffs. Examples of discipline imposed on students found to have violated the policy include in-school suspension, out-of-school suspension, assignment to the alternative school, and, where necessary and appropriate, expulsion and/or report to law enforcement.

Cross-examined about complaints of use of the racial slur "nigger," Halford was clear that use of the word is not acceptable, and students are trained and counseled against its use. The District's reports of race complaints show that for the first semester of school year 2010–11, there were 17 complaints of all kinds for all District schools, with 13 for that particular racial slur. For the second semester of school year 2011–12, there were 21 complaints of all kinds across all District schools, with 13 alleging the racial slur. Halford testified that he does not consider

the complaints regarding use of the word to be "prolific," contending that 26 complaints is a small number in the context of approximately 5,000 students multiplied by the total number of school days in two semesters. In all instances, the allegations were investigated and the students disciplined. Further, the 2009 Consent Order requires only that the District receive and investigate such complaints, not guarantee that such incidents will never happen.

Questioned by the Court regarding a biracial committee referenced in the original desegregation order, Halford testified that the committee remains in place but has not had a quorum at its meetings. He testified that the committee's stated purpose of promoting interracial harmony and understanding has been fulfilled through alternative means, specifically through training and education of students at both grade level and home-room discussions and staff development with employees about the non-discrimination policy. Mr. Halford testified that he has no reason to believe the District will discontinue implementation of the non-discrimination policy if it is declared unitary. The court finds that the proof on this issue supports the granting of the District's motion for declaration of unitary status.

### IX. Use of Nickname "Confederates" and Playing of "Dixie" at Caledonia

Of all the issues raised in the motion for declaration of unitary status, the one which concerns the court the most is the continued use of the "Confederates" nickname at Caledonia High School. Simply stated, the court can discern no good reason why a Mississippi public school would wish to associate itself with any divisive nickname or symbol. At the hearing, Halford recalled that "Confederates" had been the

school's nickname since at least 1992, and he conceded that the Caledonia student band plays a version of the song "Dixie" when its team scores a touchdown at football games.[1] Halford appeared to recognize that such a nickname can hinder the school's mission of educating students of all races. At the hearing, Halford sought to emphasize the limited nature of the school's association with the name, testifying that the Caledonia team uniforms now use the words "Caledonia," "CMS," or "CHS," instead of "Confederates" except for limited use of the word "Fed" on a baseball uniform.

The use of words and symbols in a pejorative sense hardly advances the cause of education or personal and community growth. On the one hand, some will say "we mean no harm, we are only honoring our heritage." On the other hand, another will say "this is a heritage which demeans me." The best minds of the South have long known that those with competing interpretations of the past need to find a way to overcome the past.

> We need to talk, to tell, since oratory is our heritage. We seem to try in the simple furious breathing (or writing) span of the individual to draw a savage indictment of the contemporary scene or to escape from it into a makebelieve region of swords and magnolias and mockingbirds which perhaps never existed anywhere.
>
> —William Faulkner, "An Introduction to *The Sound and the Fury*," 1933.

Faulkner's words of recognition of a need to talk, to reconcile, are still appropriate nearly 70 years later. There is nothing harmful in essence in pictures of Confederates or the playing of a tune. The harm comes to institutions and individuals when such symbols are used to purposely offend, provoke or hurt another. Such outcomes are not legitimate aims of public education.

This court seriously considered denying a declaration of unitary status based upon this issue, before ultimately deciding not to do so. After viewing the evidence at the hearing, it is the court's impression that inertia and an unwillingness to address a controversial issue have more to do with the continued use of the "Confederates" nickname at CHS than any official resistance to a unitary system. It is apparent that there are strong feelings on both sides of this issue, and, in such a situation, simple inaction is often the political path of least resistance. It was the court's impression that Halford's "heart was in the right place" on this issue. In his testimony, Halford emphasized how the school did not replace the painting of a Confederate soldier on the wall in Caledonia High School's gymnasium after it was destroyed in a tornado, but it strikes this court that men and women of good conscience should be able to summon the resolve to do the right thing without relying upon acts of God or the federal courts to do so.[2]

This court would have been more inclined to deny unitary status if the Private Plaintiffs had made a stronger showing at

---

1. The court notes that, as a song written by a northerner from Ohio, "Dixie" has not always been a symbol of southern identity only. Indeed, during public celebrations on the day after Robert E. Lee surrendered to U.S. Grant in April 1865, Abraham Lincoln asked that the band play the song, remarking that:

> "I have always thought 'Dixie' one of the best tunes I have ever heard. Our adversaries over the way attempted to appropri-

ate it, but I insisted yesterday that we fairly captured it."

2. The Private Plaintiffs note that Halford is no longer the superintendent and that, accordingly, he is not in a position to determine future policy at the District. While this is a legitimate objection, the court nevertheless found Halford's testimony to be helpful in understanding the context in which this issue arose.

the hearing, but, to reiterate, no resident actually showed up to testify on this (or any other) issue. Halford testified that he is unaware of any student disturbance or student violence at the Caledonia schools associated with the use of the word "Confederate," and he recalled only a single complaint about the playing of "Dixie" at football games. Moreover, the United States has recommended a granting of the motion for unitary status in spite of the limited use of the "Confederates" nickname at CHS. Finally, the court notes that the issues in this case have been steadily narrowed with each successive consent order, and the nickname issue is not one which was raised in the 2009 Consent Order.

■ In light of the foregoing, the court concludes that, while this issue is a troubling one, it is one regarding which the District is making steady progress and should not serve as a basis for denying declaration of unitary status. In particular, the court finds that the limited use of the Confederate nickname and the playing of Dixie are not vestiges of segregation that are "so real that they have a causal link to the *de jure* violation being remedied." *Freeman,* 503 U.S. at 485–486, 112 S.Ct. 1430. Further, there is no proof that the diminished use of the word "Confederate" or the playing of "Dixie" represent official resistance to a unitary system or were the source of racial tension. *See Augustus v. School Board of Escambia County, Florida,* 507 F.2d 152, 157 (5th Cir.1975). The court will therefore not deny unitary status based on this issue, based on this court's trust that local leaders should decide local issues absent federal direction, to the fullest extent possible.

## X. Ultimate Findings of Fact and Conclusions of Law and Relief

■ Based on the testimony and all evidence presented, the court finds that the District has eliminated all vestiges of de jure discrimination to the extent practicable, has complied with this Court's desegregation plan and orders for a reasonable period of time, and has demonstrated its good-faith commitment to the constitutional rights that were the original predicate for the injunctive relief this Court awarded. *Freeman v. Pitts,* 503 U.S. 467, 491, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); *Board of Education v. Dowell,* 498 U.S. 237, 249–250, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). The Lowndes County School District's motion for declaration of unitary status [114–1] is therefore granted, and this case is hereby dismissed.

A separate judgment will be entered this date pursuant to Fed.R.Civ.P. 58.

### *JUDGMENT*

For the reasons given in the court's order issued this date, it is hereby ordered and adjudged that this case is dismissed with prejudice.